# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

SANTIAGO PINEDA,
Defendant and Appellant.

S150509

Los Angeles County Superior Court
NA061271

June 27, 2022

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Corrigan, Kruger, Groban, Jenkins, and Guerrero concurred.

Justice Liu filed a concurring opinion.

PEOPLE v. PINEDA

S150509

Opinion of the Court by Cantil-Sakauye, C. J.

Defendant Santiago Pineda was convicted in Los Angeles County Superior Court of the murders of Rafael Sanchez (also known, and referred to at trial, as Juan Armenta) and Raul Tinajero. (Pen. Code, § 187, subd. (a).)[1] Special circumstance allegations that the murder of Sanchez occurred during the commission of a robbery (§ 190.2, subd. (a)(17)), that the murder of Tinajero involved the killing of a witness (*id*., subd. (a)(10)), and that defendant had been convicted of multiple murders (*id*., subd. (a)(3)) were found true. At the penalty phase of trial, the jury returned a sentence of death.

On appeal, defendant asserts that a juror was improperly excused for cause, evidence was wrongly admitted, and other errors were committed at his trial that, individually and collectively, require reversal of the judgment. We affirm the judgment in its entirety.

## I. FACTS

### A. Guilt Phase

The prosecution's theory of the case was that defendant, accompanied by Tinajero, killed Sanchez in the early morning hours of March 7, 2002, by running him over with a car. Defendant was charged with Sanchez's murder. Tinajero then

_____

[1] All subsequent undesignated statutory references are to the Penal Code.

1

testified at defendant's trial, pursuant to a grant of immunity from prosecution. That trial resulted in a mistrial after defendant's attorney fell ill. Defendant and Tinajero were both housed at the Men's Central Jail in Los Angeles as defendant awaited retrial. On April 20, 2004, defendant — who was supposed to be kept away from Tinajero — gained access to Tinajero's cell and choked him to death.

### 1. People's Case

#### a. Killing of Rafael Sanchez

With Tinajero being unavailable to testify, his testimony at the previous trial was presented to the jury. (See Evid. Code, § 1291, subd. (a)(2).)[2] Tinajero's prior testimony described the events of March 6 and 7, 2002, as follows.

On March 6, Tinajero and defendant were passengers in a car being driven by defendant's friend. Tinajero, who was 18 years old at the time, had been defendant's neighbor for years. While they were stopped at an intersection, defendant engaged in a conversation with Sanchez, who was driving a nearby vehicle. Tinajero had never met Sanchez before, and to his knowledge, neither had defendant. Sanchez was driving a white Infiniti; Tinajero thought he looked drunk. Defendant reached out of his vehicle to hand a bottle of tequila to Sanchez, who took a drink from the bottle and then returned it.

Tinajero, defendant, and defendant's friend then drove to defendant's house in Wilmington, which was on a street that intersected with another street named Blinn. Sanchez followed in his Infiniti. The four men hung out in front of defendant's

---

[2] At the time he testified, Tinajero was in custody for forgery and driving a vehicle without permission.

house for a while. Tinajero, Sanchez, and defendant eventually decided to go to Long Beach to "pick up some girls." They left together in Sanchez's Infiniti, with Sanchez driving.

On the way, the men stopped at a house where defendant's cousin joined them in the car. After driving more, Sanchez stopped the car in an alley, where he, defendant, and defendant's cousin all exited the vehicle to urinate.[3] Defendant and his cousin then ran back to the Infiniti and drove away, stranding Sanchez.

Defendant drove the Infiniti back to Wilmington and parked the car a block away from his house. Defendant, his cousin, and Tinajero proceeded to defendant's house. Sanchez returned, now driving a Honda. Sanchez wanted his Infiniti back and seemed upset. Defendant falsely said that the vehicle was in Long Beach and told Sanchez he would help him find it. Sanchez, defendant, and Tinajero then left together in the Honda, with Sanchez driving.

At some point, Sanchez stopped the Honda at his sister's house and went inside. Defendant and Tinajero did not join him. When Sanchez was inside the house, defendant told Tinajero that he intended to choke Sanchez and steal the Honda, too. Defendant asked Tinajero to participate, but Tinajero declined, saying he did not want to be involved. Tinajero and defendant changed positions in the car, with defendant moving from the front seat to the backseat and Tinajero moving forward.

After Sanchez returned, he drove his passengers around to find the Infiniti. Defendant and Tinajero pretended to look

---

[3] Tinajero testified that he and defendant had been drinking that day, with each of them consuming about six beers.

for the vehicle. Sanchez eventually stopped the Honda in Palmer Court, an alley in Long Beach. Defendant reached around the driver's headrest and started to choke Sanchez. Sanchez did not resist. Once it appeared that Sanchez had passed out, defendant opened the driver's door from the inside and threw Sanchez out of the car, onto the ground. Defendant then hopped into the driver's seat. Driving short distances forward and backward, he ran over Sanchez several times.

Defendant and Tinajero took the Honda back to Wilmington. There, the two men switched back to the Infiniti they had previously taken from Sanchez. With defendant now driving the Infiniti, they returned to Palmer Court. Defendant told Tinajero he wanted to "go check it out." When they arrived, defendant, driving fast, ran over Sanchez once again. Tinajero was unsure whether defendant had seen Sanchez before striking him.

The fire department arrived at the scene while defendant and Tinajero were still in the alley. Defendant maneuvered the Infiniti so the fire engine could pass and then drove a short distance away. He parked the car and walked back to the alley with Tinajero. They saw the fire department attending to Sanchez. Defendant and Tinajero then returned to the Infiniti and drove away, intending to return to Wilmington. Before they could go far, they were pulled over by police and taken into custody.

When in custody after his arrest, Tinajero told police that defendant had not run anyone over. More than a week later, after he had been released and police came to his house to speak with him, Tinajero confessed to his and defendant's involvement in Sanchez's death.

Other witnesses also testified regarding the events leading to Sanchez's death and the investigation that followed.

Eduardo Quevedo, Sanchez's close friend, testified that Sanchez had come to his apartment at around 11:00 p.m. on March 6, 2002. Sanchez was with two other men, one of whom Quevedo identified in court as defendant. They arrived in Sanchez's Infiniti. Quevedo noticed that Sanchez was drunk. Sanchez declined Quevedo's offer to take him home and left along with defendant and the other man.

About a half-hour later, Sanchez returned on foot. Quevedo asked what had happened. Sanchez said he had been beaten up and that the men he was with had taken his car. Sanchez seemed upset. Quevedo tried to talk Sanchez into going home, but Sanchez told him to drive to an automobile repair shop where he worked. Quevedo dropped Sanchez off at the shop and parked nearby to see what Sanchez would do. He noticed Sanchez drive off in a Honda. Quevedo tried to follow Sanchez, but was unsuccessful. When returning home, at some point Quevedo saw Sanchez's Infiniti pass by "really fast." He was unable to see who was driving.

Sanchez's sister, Patricia Armenta, testified that Sanchez visited her home in Long Beach at 1:30 a.m. on March 7, asking for something to eat. He seemed angry, and said that his car had been stolen and that he knew who had done it. Sanchez told her that the culprits lived in Wilmington on Blinn Street. He added that he was going to go to where those people were located. Sanchez was at Armenta's house for 10 or 15 minutes. Before leaving, he said he had some people with him he was going to drop off.

Virginia Ramos and David Rodriguez testified that they were living on Palmer Court at the time of Sanchez's death. Ramos recalled that she was up early during the morning of March 7 to get some milk for her daughter when she looked out her kitchen window and saw a dark-colored car parked outside. Normally no car would be parked there at night. Rodriguez also saw a small dark car with a few people around it. Between 15 minutes and a half-hour later, their dog barked. Rodriguez went outside. The car was gone, and there was a man crawling on the ground. The man was moaning, and Rodriguez thought he might be drunk, or that he might have been beaten. Rodriguez returned to his residence to call an ambulance and then went back outside. Five or ten minutes later, a small white car turned into the alley, traveling at a speed that Rodriguez estimated as 25 to 30 miles an hour. Rodriguez was quite sure the car had its lights on. Rodriguez went inside because he did not want to see the man in the alley get hit. Ramos and Rodriguez heard two thumps. They both watched as the white car passed by their home. The vehicle then made a three-point turn and headed the other way. Ramos called 911, reporting that the man Rodriguez had called about earlier had since been run over by a car. Rodriguez saw the white car become temporarily blocked in the alley by an arriving fire engine, and then leave the scene.

Fire department personnel testified that at approximately 1:50 a.m. on March 7, they responded to a report of a staggering man on Palmer Court in Long Beach. Their progress into the alley was blocked by a white vehicle, with two male Hispanic passengers inside. The vehicle had some damage to its front end and a broken windshield. The white vehicle was maneuvered into a parking area so that the truck could pass. The fire captain

provided a description of the vehicle to dispatch. Sanchez was found on the east side of Palmer Court, approximately 150 to 200 feet from its north end. He was in critical condition, lacked a pulse, and was not breathing. Sanchez never regained a pulse or resumed breathing.

A City of Long Beach police officer testified that he received a call early in the morning of March 7 regarding an injured pedestrian on Palmer Court. He was advised that the person might have been hit by a vehicle. A description of the car and the suspects was provided. The officer saw a car matching this description half a block from Palmer Court. The car did not have its headlights on. The officer followed the car for a while, then pulled it over. The vehicle was a white 1992 Infiniti G20 with two occupants: defendant and Tinajero. The officer detected a scent associated with alcoholic beverages when he spoke with defendant. Fire department employees who had placed the call identified the vehicle as the one they had seen at the scene of the incident.

An accident investigator for the Long Beach Police Department testified that he responded to Palmer Court early in the morning of March 7. From his investigation, he concluded that Sanchez had been struck once by a vehicle traveling southbound along Palmer Court. He testified that although the Infiniti had damage to its front bumper and windshield, this damage appeared to have been older and not caused by a recent collision. An examination of the underside of the Infiniti revealed fresh damage to a corner of the oil pan and scrape marks along the undercarriage. The damage was consistent with the vehicle having something lodged against it and dragging it along the pavement. From these observations, it was the investigator's opinion that Sanchez had been lying flat on

the ground at the time of impact. The investigator estimated the speed of the vehicle at the time of impact as approximately 30 to 35 miles per hour.[4] A sample of red liquid recovered from the underside of the Infiniti subsequently tested positive for human blood and returned a one-in-564-trillion match with Sanchez's DNA.

A coroner's office medical examiner testified that Sanchez died from multiple traumatic injuries resulting in blood loss and loss of vital functions. Sanchez's injuries included general abrasions, going in different directions, to the right side of his body; abrasions on his face; nine fractured ribs; a fractured right clavicle; bilateral fractures to the front of his pelvis; and lacerations to his lungs, liver, pancreas, bladder, and prostate. Sanchez had no brain trauma. Sanchez also had a fractured hyoid bone in his neck and hemorrhages in the sclera of his eyes, injuries consistent with strangulation. Sanchez had no illegal drugs in his system, but postmortem tests returned an elevated blood alcohol level. In the examiner's opinion, based on the injuries Sanchez received, including the multidirectional abrasions found on his body, he had been run over more than once. On cross-examination, the witness testified it was possible

---

[4] The Honda taken from Sanchez was recovered a few days later by Miguel Aranda, Sanchez's employer at the automobile repair shop. Aranda was not aware that the vehicle had been involved in a crime and did not pay attention to whether there was any damage to its body or windows. The vehicle was impounded by law enforcement two months later, after a repair had been made to it. A subsequent search of the vehicle yielded no trace evidence of it having been used to roll over someone. The responsible investigator testified that the undercarriage of the vehicle "was very clean," which was unusual for a vehicle that had traveled more than 80,000 miles.

the abrasions could have been caused by a body tumbling as it was being moved along the ground.

### b. *Killing of Raul Tinajero*

On March 11, 2002, defendant was charged with vehicular manslaughter (§ 192, subd. (c)(3)), driving under the influence, causing injury (Veh. Code, § 23153, subd. (a)), and leaving the scene of an accident (Veh. Code, § 20001, subd. (a)) in connection with Sanchez's death. Defendant pleaded not guilty to these charges. Tinajero testified at the preliminary examination. The one count information filed by the prosecution after the preliminary examination alleged that defendant had murdered Sanchez (§ 187, subd. (a)). Tinajero then testified at defendant's trial, which resulted in a mistrial after defendant's attorney became ill. As explained below, Tinajero was killed before a retrial could occur.

In April 2004, defendant and Tinajero were housed in separate areas of the Men's Central Jail in Los Angeles. A directive that defendant and Tinajero be kept apart was in place.

Three of Tinajero's cellmates in cell D13 at the jail testified at trial. This cell was at the end of its row in the 2200 module, on the jail's 2000 floor. Its interior was not visible to jail guards when they were positioned at the cell module's officer station.

The first cellmate to testify was Anthony Sloan, who was in custody on kidnapping charges at the time of the killing. Sloan related that on April 20, 2004, defendant came into the cell along with another cellmate, who was returning from a parole hearing. Sloan recognized defendant from prior interactions and asked him what he was doing. Defendant said that "Raul" was his "crimee" — meaning he was involved in the

same criminal case as defendant — and was going to testify in the case. Defendant went to the upper bunk where Tinajero was sleeping, jumped into position, and placed Tinajero into a headlock. Tinajero struggled to break free, but could not escape the hold. At some point, defendant told everyone else in the cell to look away. Tinajero stopped moving. Defendant stuck Tinajero's head in the cell's toilet for a few minutes, then threw his body on the floor and began to stomp on it. Sloan heard a loud popping or snapping noise as defendant stomped on Tinajero. Defendant then tied something around Tinajero's neck, put him on a mat, threw a sheet over him, and positioned his body under a bed.

Afterward, defendant cleaned up the cell and made phone calls using a phone in the cell. Sloan heard defendant say, "Tell them it's a touch down." Defendant then sent a note down the cell row to obtain some cigarettes and a light. He told Sloan and the other cellmates that Raul had testified against him, that there had been a mistrial due to his attorney's medical condition, and that he had a "better chance" if Tinajero could not testify again. Defendant wrote the names and booking numbers of the remaining cellmates, as found on their jail-issued wristbands, in a notebook he had. He told them, "You know what time it is." Sloan interpreted defendant's statement as meaning that he "would probably be the next one if [he] was to . . . say anything."

Jail personnel came by for a clothing exchange while defendant was still in the cell after Tinajero's death, but Sloan was scared and said nothing to them. Later, when it was time for an inmate transfer from the Men's Central Jail to another facility, the door to cell D13 opened and defendant left with another cellmate. Sloan then called his attorney and his mother

and told them what had happened.[5] He did not report the killing to deputies at the jail at that time, for fear of being labeled a snitch. But later, when the cell door was opened as another cellmate returned from a court date, Sloan and the other cell occupants all exited the cell and told a deputy there was a "man down" inside the enclosure.

Matthew Good, another of Tinajero's former cellmates, provided generally similar testimony. He related that defendant came into the cell, found Tinajero asleep, and then proceeded to choke him, dunk his head in the toilet, and jump on his chest. Defendant positioned Tinajero's body on a mat that was then slid under a bunk, cleaned up the cell, used the phone, and then, while hanging out in the cell, told another inmate that the person he had killed intended to testify against him again. Before leaving the cell, defendant recorded the other cellmates' names and booking numbers in his notebook.

The third cellmate to take the stand, Gregory Palacol, testified that as he was returning from a parole screening on the morning of April 20, he encountered defendant in a waiting room area within his module. Defendant asked Palacol what cell he was in. When Palacol told him, defendant asked if there was someone named "Smoky from West Side" in the cell. Palacol

---

[5] Sloan's mother testified that Sloan had called her from jail on April 20, 2004. He told her that "one is here and one is gone," leading her to infer that there was a dead body in his cell. She then called and spoke with Sloan's attorney, Andrew Stein. Stein, testifying upon Sloan's waiver of the attorney-client privilege, stated that Sloan had called him at around 3:30 p.m. on April 20, 2004, "hysterical and almost in tears," and told him that a man had entered his cell, instructed him to turn around, and killed one of his cellmates. Stein thereafter called the jail to report what had occurred.

said that he thought so. Palacol saw defendant pick up a homemade cross on a string, tear the cross off, and put the string in his pocket. When it came time for inmates collecting in the waiting area to return to their cells, defendant followed Palacol to cell D13. Tinajero was asleep in his bunk. Defendant sat on the cell's toilet bowl for a few minutes. He then placed Tinajero in a headlock and pulled him off his bunk. Defendant had Tinajero in a headlock for 10 or 15 minutes. At some point, Tinajero stopped moving and appeared to have been rendered unconscious. Defendant then put Tinajero's head in the toilet, with Tinajero's face in the water and defendant's knee behind Tinajero's neck. Defendant flushed the toilet. Defendant kept Tinajero's head in the toilet for a few minutes, then laid him on the floor. Defendant next put his foot on Tinajero's neck and "started bouncing" on it.

Palacol testified that defendant subsequently dressed Tinajero, put him on a mat, put a string around his neck, tore off Tinajero's wristband and flushed it down the toilet, slid his body under a bunk, and cleaned up the cell. Afterward, defendant made a few phone calls, then looked at magazines. As had Sloan and Good, Palacol also testified about statements defendant made after the killing. Defendant told him that Tinajero had been brought down from state prison to testify against him in an earlier murder case in which defendant had killed someone and taken his car. Defendant said that getting rid of Tinajero would be better for his case. Defendant left the cell several hours later, incident to a prisoner transfer. Similarly to Good and Sloan, Palacol testified that defendant recorded the remaining cellmates' names and booking numbers before he left.

Jail records showed that at 5:02 a.m. on April 20, defendant was scanned into the inmate reception center, an area where inmates gathered to be taken to court. He was scanned out at 8:31 a.m., meaning he had not gone to court. Sometime between 3:00 p.m. and 4:00 p.m. on April 20, defendant tried to pass by officers who were supervising an inmate transfer line in the jail's 2200 module. Asked to identify himself and explain where he was going, defendant said that he was visiting from the jail's 3000 floor to see his "cousin." Defendant was searched and directed back to his floor.

Jail deputies were alerted to Tinajero's death by Good and his other cellmates at around 4:20 p.m. on April 20. When deputies responded to the cell, Tinajero's body was found underneath a bunk, on a mat, covered with a blanket. That evening, a sheriff's deputy visited defendant due to his status as a known "keep-away" from Tinajero. The deputy took defendant's clothing, including his pants. The deputy saw what he thought might be bloodstains on a pant leg. The deputy also found a small notebook in defendant's clothing. The phrases "El Chingon" and "ES Wilmas," and the names and booking numbers of Sloan, Palacol, Good, and a fourth cellmate, Shad Davies (who did not cooperate with the investigation into Tinajero's death and did not testify at trial), were all written inside. So too was the text "RT," near which appeared a number that was one digit different from Tinajero's booking number at the jail. A search of defendant's cell yielded transcripts of Tinajero's prior testimony, other court documents, and police reports prepared in connection with the investigation regarding Sanchez's death. Two days later, a detective noticed a scratch or scratches on defendant's right hand during an interview.

An investigator with the county coroner's office who arrived at cell D13 on the evening of April 20 estimated Tinajero's time of death as approximately 12:00 p.m.  The investigator noted bruising around Tinajero's neck and bloodstains around Tinajero's mouth, chest, clothing, and legs.  There were also bloodstains on Tinajero's boxer shorts but not on his pants, leading the investigator to conclude he had been redressed.  The investigator noted a pattern on Tinajero's neck that was similar to the pattern on shoes worn by jail inmates.  Tinajero's wristband was missing.

A medical examiner who performed an autopsy on Tinajero's corpse determined that he died from asphyxia due to strangulation by ligature, although manual strangulation or an arm hold could not be excluded as the cause of death.  Tinajero had abrasions to the front and back of his neck; bruises to his neck, tongue, and upper back; blunt trauma to the neck; hemorrhages to his front neck muscles; an abrasion on his left shoulder; and minor abrasions on his right knee.  Petechiae (pinpoint hemorrhages) in Tinajero's eyes and a fractured cricoid, an area of cartilage just beneath his voice box, also were consistent with strangulation.  Blood was coming out of Tinajero's mouth, and there was dried blood on various parts of his body, which could have come from his mouth or from the abrasions around his knee.

A forensic serologist who performed DNA tests on the blood found on defendant's pants testified that it came from Raul Tinajero, with a probability of one in 110 quadrillion that someone else left the blood.  The serologist also obtained DNA profiles of four or more people from the ligature placed around Tinajero's neck.  In addition to finding DNA consistent with

Tinajero's DNA profile on the ligature, the serologist determined that defendant could have been one of the donors.

Two sheriff's deputies testified concerning statements defendant made to them. Jesus Argueta testified that sometime between May 3 and May 6, 2004, defendant called him to his cell and asked whether Argueta had heard "what happened." Argueta had grown up in the same neighborhood as defendant and the two were acquaintances prior to defendant's incarceration. Argueta replied that he had not. Defendant responded that he was being accused of killing his "crimee," further explaining that he and the crimee had committed a murder together, and that "this fucker, he's snitching on me, so we had to get rid of him." Now that the crimee was dead, defendant said, "[T]hey're going to have to offer [him] a deal" because "they wouldn't have shit on [him] now." Argueta did not take notes of the conversation, and did not report it to a superior until several days had elapsed.

Josue Torres, another deputy sheriff, testified that on May 3, 2004, he was escorting defendant back from court. Defendant had previously a been a trusty, or helper, for Torres. Defendant was smiling at Torres and told him, "Hey, Torres, I did it," elaborating that he had "killed the fool that snitched on him." Defendant told Torres that he had obtained approval to "take care of his business" by showing appropriate "paperwork" to the inmate who ran Tinajero's floor at the jail. Defendant further explained that he had procured a court pass belonging to someone else, left his cell, and went to a central inmate receiving station within the jail. When his wristband was scanned there and found not to match his pass, defendant apologized and left. But instead of going back to his cell, defendant went to Tinajero's. There, he saw Tinajero lying

15

down. Defendant got on top of Tinajero and flipped him over. Tinajero saw defendant and tried screaming for help. Defendant started choking him. The two men struggled. Defendant put Tinajero's head in the toilet and, with his knee atop Tinajero's head, flushed the toilet to try to drown Tinajero. Once defendant saw that Tinajero was not moving, he checked for a pulse. Finding none, defendant cleaned up the area, taking Tinajero's wristband off and flushing it down the toilet. He also took out his notebook and wrote down the names and booking numbers of the other inmates in the cell. To make sure that Tinajero was dead, defendant stomped on his chest to see if there would be a reaction. There was not. He then stretched out a plastic trash bag and tied it tightly around Tinajero's neck. Afterward, defendant waited in the cell until it was time for an inmate transfer, at which time he went back to his assigned cell.[6]

Other witnesses during the prosecution's case-in-chief testified regarding communications with defendant, incidents in which defendant committed rules violations at the jail, how the jail controlled and kept track of inmate whereabouts, and gang activity at the jail and its relationship to the Tinajero killing.

Among this evidence, Irma Limas testified that she was employed as a corporate receptionist in April 2004 when she began to receive phone calls and letters from someone who identified himself as "Santi" and "Chingon." Limas told this person her name was "Irma Gardea"; this name, and Limas's address and phone number, were written in the notebook found in defendant's possession shortly after Tinajero's death. Santi,

---

[6] When defendant subsequently took the stand, he denied making the statements to Argueta and Torres.

whom Limas never met in person during the course of their communications, said that he was in jail on a "187" (the Penal Code section for murder) for running over somebody. At some point, Santi asked her to try to use her computer to determine if someone named Raul, whom Santi "needed to get ahold of," also was in jail. Santi told Limas that Raul was a "clown" who was testifying against him. Limas did not comply with the request, but Santi later told her that a friend or "homie" of his had obtained the information for him. Santi also told Limas that he had obtained a wristband from another inmate in an attempt to escape. Limas authenticated letters and a card sent to her from "Chingon Santi" or just "Chingon." Another letter to Limas, signed "Santiago Pineda Hernandez Chingon," provided that it was "from the Big Bad Ass ES Wilmas," which Limas testified was a gang.

Testimony from other witnesses delved into the policies, practices, and procedures that were in place at the Men's Central Jail at the time of Tinajero's death. This testimony addressed, among other subjects, the extent to which possession of a court pass could enable an inmate to move freely around the jail. A sheriff's deputy testified that if an inmate wanted to get from his own cell to another area of the jail, he could leave his module using a court pass that might be obtained from another inmate. If an inmate went to the jail's inmate reception center with a pass, and it was at that time discovered that he was not going to court, he would be told to return to his cell module. The same deputy agreed with the assertion that once an inmate left his floor with a pass, for the most part it was "really on the honor system for them to go to the right location." A majority of the general population inmates with passes would not have been handcuffed. Defendant, being housed in the general jail

population on April 20, 2004, would not have been handcuffed or escorted to different locations at that time, but instead would have been subject to the honor system described by the deputy. Upon arriving at a cell module, an inmate would have been asked for his name and whether he lived in the module. Wristbands or passes were generally not checked in these situations to confirm an inmate's identity.

A jail inmate and deputies also testified regarding a series of incidents, occurring before and after Tinajero's death, in which defendant violated jailhouse rules by escaping from secure facilities or areas, possessing contraband, and not wearing his identifying wristband. Witnesses also testified about gang influence and culture at the jail, especially as it related to the role of gangs in sanctioning retaliation against informants and whether gang members would rely on nonmembers to administer such punishment. In his testimony concerning gangs at the jail, one witness, Deputy Javier Clift, was allowed to opine that defendant was a member of the Sureño gang. Clift also testified regarding a letter he had intercepted, in which defendant wrote, "I go to trial next month, so I have decided to let my hair grow and with a clean shaved face with some retarded glasses and a nice suit, the not guilty look," followed by a simple drawing of a smiling face. Clift's testimony regarding gangs and defendant's gang membership, as well as the other gang and misconduct evidence described in this paragraph, will be discussed at greater length *post*, in addressing defendant's claims that this evidence was admitted in error.

## 2. *Defense Case*

A Long Beach police officer testified that he administered a drug recognition evaluation on defendant after his arrest during the early morning hours of March 7, 2002. From this evaluation, the officer concluded that defendant was under the influence of a central nervous system stimulant, cannabis, and alcohol, and recommended that he be charged with driving under the influence. Defendant told the officer that he had been using methamphetamine and marijuana earlier that evening. A breathalyzer test administered at the police station returned a blood alcohol concentration of .05 to .06 percent.[7] A criminalist testified that a subsequent test of defendant's urine returned positive results for amphetamine, cannabinoids, and cocaine metabolite. The urine sample also contained a quantity of alcohol translating to a blood alcohol concentration of approximately .08 percent; however, testing of a blood sample taken from defendant returned no alcohol content.

Defendant took the stand on his own behalf. He testified that he and Tinajero had been drinking and using drugs when they met Sanchez. The three men went to defendant's house and drank some beer. They left to acquire more drugs. Defendant acknowledged driving away and leaving Sanchez in an alley, but testified it was just a trick or a gag. According to defendant, Sanchez was already at defendant's house when defendant returned. Defendant told Sanchez that he had taken his car just to play with him. The three men then left to continue

---

[7] This officer was briefly recalled as the sole witness offered by the People in rebuttal at the guilt phase.

looking for drugs, with Sanchez driving a Honda that he had brought to defendant's home.

Defendant further testified that after stopping at the house of Sanchez's sister, the men went to Palmer Court to get drugs. There were other people in the alley when they arrived. After Sanchez began to speak with them, a fight broke out. As the men in the alley were striking Sanchez, defendant drove off in Sanchez's car. Defendant went to a friend's house in his neighborhood, obtained a gun, and then returned to Palmer Court in Sanchez's Infiniti, leaving the Honda in Wilmington. Defendant turned the Infiniti's headlights off as he entered the alley. As he was driving, defendant heard a "big bump" and then noticed that something was being dragged by the car. He made a U-turn and told Tinajero to open the door to see what it was. It was Sanchez. Defendant denied intentionally hitting Sanchez with the Infiniti. The fire department arrived before defendant and Tinajero could take Sanchez to the hospital. Defendant, being high and in the possession of a gun, drove off.

Defendant also denied killing Tinajero. He testified that while in custody at the Men's Central Jail, he had received information that some people were going over to Tinajero's cell. Defendant tried to make sure nothing would happen to Tinajero, and was told that nothing would occur that day, but heard that "they couldn't just leave him alone, they had to at least regulate him."[8] Defendant went to Tinajero's cell the next day because he did not want anything to happen to him. Defendant believed it would be worse for his case if Tinajero was harmed; and that, in any event, no "regulation" of Tinajero had been properly

---

[8] "Regulate," in this context, means a beating administered by other inmates.

authorized. Tinajero, defendant testified, was already dead and tucked under the bunk in his cell by the time defendant arrived. Defendant acknowledged that he had made telephone calls from Tinajero's cell. Defendant explained that he feared being blamed for Tinajero's death, and so he felt he had to contact people to do something.

The jury returned guilty verdicts on both counts and found all special circumstances to be true. The case then proceeded to a penalty phase.

## B. Penalty Phase

### 1. People's Case

The People's witnesses at the penalty phase included several sheriff's deputies who testified about incidents offered as section 190.3, factor (b) evidence, through which "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence" can be introduced into evidence for consideration by the trier of fact. To the extent that defendant argues this evidence should not have been admitted, the specific proof involved will be described later in this opinion.[9]

Defendant does not challenge the introduction of evidence offered at the penalty phase under section 190.3, factor (b) regarding a jailhouse incident that took place on November 5, 2004. On that date, defendant (who by then was housed within the jail's high security module) was seen in his cell drinking

_____

[9] Defendant also admitted to having incurred a conviction for grand theft auto, and the jury was advised at the penalty phase that it could consider this conviction as an aggravating circumstance if proved beyond a reasonable doubt. (See § 190.3, factor (c).)

pruno, an alcoholic beverage covertly brewed by inmates. When deputies tried to take the pruno away, defendant, who appeared to be intoxicated, said to one of them that for telling on him, he would stab him when he least expected it. The deputy asked defendant if he was threatening him; defendant replied that he was. Defendant was noncooperative as deputies tried to remove him from his cell. A Taser was deployed, but it was ineffective due to the baggy clothing defendant was wearing. Eventually defendant was handcuffed and removed from his cell. During this process defendant was "thrashing about, using his legs, his hips, his feet, anything" to frustrate his extraction. He spit on a deputy and kicked a deputy in the leg.

Other witnesses at the penalty phase testified regarding their relationships with Sanchez, whom they referred to as Juan Armenta.

Eduardo Quevedo testified that he had known Sanchez for eight years. Quevedo testified that Sanchez was a "nice person" who "was always smiling," would "always help everybody," and "never asked for anything back."

Patricia Armenta, Rafael Sanchez's sister, also returned to the stand and testified that her brother was a year and a half older than she was. He was "the best" brother and "a good person" who "liked to help others." He also was a good uncle to her children. He would bring presents to other people to make them happy. He was a mechanic and hoped to open his own shop. When Sanchez saw that someone's car was not working, he would stop and help them; when someone's car was broken down on the side of the road, he would give that person a ride. When Patricia Armenta was shown a photo of her brother after his death, she "wanted to die." She could only recognize his eyes

in the photo. She related that she was "not the same person" since her brother's death.

Maria Armenta, Rafael Sanchez's mother, testified that she had learned on her birthday that her son had died. Her son was a good person, a good father, a good brother, and a good son. He was "the biggest thing" to her, "her pride." She testified that "wherever there was a person that needed help, he was there." Sanchez worked two jobs and lived with her after his wife and daughter moved to Minnesota. Maria Armenta's "life ended together with his"; she was "finished." By this, she meant that her "life has no meaning as it had before." She missed "everything" about her son.

### 2. *Defense Case*

Several of defendant's family members and a family friend testified concerning the circumstances of defendant's upbringing and their relationships with him. Defendant's father was an alcoholic who would beat him with a belt, hose, and other implements. Defendant started to work at his father's cabinet shop at a very young age. He sometimes worked into the evening and on weekends, leaving little time for play. Defendant's father encouraged him to fight and was proud of his son when he fought back against others. Defendant would use money he earned working to help his family pay bills or to buy them shoes and clothes. The testimony from defendant's family members also touched upon defendant's drug use, which included the abuse of heroin and cocaine.

The defense presented additional witnesses to support its mitigation case. Three teachers at defendant's elementary school testified regarding their interactions with him. Adrienne Davis, a clinical psychologist, testified that several factors,

including a father with a substance abuse problem, poverty, early exposure to drugs and alcohol, family instability, abuse at the hands of a parent, attention deficit hyperactivity disorder, and a lack of socialization opportunities may have predisposed defendant to commit, or contributed to his involvement in, the charged crimes. Davis opined that defendant also lacked a positive role model whose influence might have offset the impact of these factors. A correctional consultant, James Esten, testified regarding defendant's possible custodial environment if he were sentenced to life without the possibility of parole.

### 3. *People's Rebuttal*

In rebuttal, the jury heard testimony from Luis Puig, a Department of Corrections and Rehabilitation employee, regarding why defendant would not necessarily be placed in one of the facilities Esten had described and about the differences between the conditions of confinement for prisoners sentenced to life without the possibility of parole and prisoners sentenced to death.

The People presented evidence that contraband was found in defendant's legal mail during a search of defendant's cell occurring on December 29, 2006. The jury also heard testimony regarding an incident at the jail on January 4, 2007 (after the commencement of the penalty phase), in which defendant was found to have in his possession sealed personal letters within an envelope marked "legal mail." It was a violation of jail rules for defendant to be in possession of sealed personal correspondence. Deputy Clift was recalled to the stand and testified regarding the contents of the letters seized from defendant at that time.

After retiring to deliberate at the penalty phase, the jury sent a note to the trial court asking how to proceed because it

was not unanimous regarding one of the counts. Returning to the courtroom, the jury rendered a verdict of death for the murder of Raul Tinajero (count two). After further dialogue with the court, the jury resumed its deliberations regarding the other count. Two days later, the jury returned a verdict of death on count 1, the murder of Rafael Sanchez. The trial court subsequently denied a defense motion for a new trial as well as the automatic motion for reduction of the penalty from death to life imprisonment without the possibility of parole. (§ 190.4.)

## II. DISCUSSION

### A. Pretrial Issues

#### 1. *Excusal of Juror for Cause*

Defendant argues that the trial court violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, 16, and 17 of the California Constitution when it excused Prospective Juror J.W. for cause. The trial court granted the People's request to dismiss J.W. from service, finding him "disqualified both on the general circumstances of the answers that he's given and on his penalty phase answers." We find no error.

##### a. *Facts*

Prospective Juror J.W. was excused for cause after completing a juror questionnaire and undergoing voir dire with the trial court and counsel.

###### i. *Juror Questionnaire*

J.W. expressed inconsistent views in his questionnaire responses.

Some of J.W.'s responses indicated he would refuse to vote to convict defendant if doing so would make defendant eligible

for the death penalty and that he would never under any circumstances vote for the death penalty. After describing the allegations against defendant, the questionnaire asked, "No matter what the evidence shows, would you refuse to vote for guilt as to first degree murder or refuse to find the special circumstances true in order to keep the case from going to the penalty phase, where death or life in prison without the possibility of parole is decided?" J.W. responded, "yes." Meanwhile, J.W. responded "no" to the question, "Given the fact that you have two options available to you, can you see yourself, in the appropriate case, rejecting life imprisonment without the possibility of parole and choosing the death penalty instead?"

Conversely, other answers to questions posed in the juror questionnaire indicated that J.W. was prepared to consider the death penalty as a sentencing option. J.W. answered "no" to the question, "If the jury found a defendant guilty of intentional first degree murder and found a special circumstance to be true, would you always vote against death, no matter what other evidence might be presented at the penalty hearing in this case?" When asked whether he thought death or life without the possibility of parole was a worse sentence for a defendant, J.W. circled the latter option, explaining, "boring with no life." J.W. strongly agreed with the statement, "Anyone who intentionally kills another person should always get the death penalty," adding, "an eye for an eye," and he strongly disagreed with the statement, "Anyone who intentionally kills another person should never get the death penalty."

Among his other written responses to questions concerning the death penalty, J.W. answered, "only God has the right" to the question, "What is the view, if any, of your religious organization concerning the death penalty?" J.W. responded

with a "Yes" to a follow-up question inquiring if he felt obligated to accept that view, explaining, "same as above." As among "strongly in favor," "moderately in favor," "strongly against," "moderately against," or "neutral," J.W. described his philosophical opinion regarding the death penalty as "neutral." Where the questionnaire inquired whether he felt the death sentence was imposed "too often," "too seldom," "randomly," or "about right," J.W. circled "about right," adding, "hard to take a life." In response to a question asking if he had thought about whether he was for or against the death penalty before coming into court, J.W. circled "yes," with the explanation, "having to judge the right or the wrong." And J.W. responded with a "no" to a question asking whether his opinion about the death penalty had changed over the years.

Some of J.W.'s other responses to questions posed in the questionnaire, although not directly concerned with the death penalty, would also become the subject of probing by counsel and the court in subsequent voir dire:

- J.W. responded "no" to the question, "Can you set aside any sympathy, bias, or prejudice you might feel toward any victim, witness, or defendant?" and provided the explanation, "you need to be honest."

- He responded "no" to the question, "Will you consider along with all of the other evidence presented, the testimony of an unavailable witness (for example, one who is too ill to come to court) whose prior testimony is read to you?" In response,

27

J.W. explained, "[I]t's hard to except 2nd hand information."[10] Yet J.W. also answered "no" to the question, "Will you automatically reject the testimony of an unavailable witness merely because the actual witness is not present[?]"

- He answered "yes" to the question, "If you believed that it was wrong for the prosecution to ask the Court to grant immunity from prosecution or to give special consideration in another case in exchange for a witness testifying here, would you hold that against the prosecution and refuse to convict even if shown the defendant is guilty[?]" He explained, "If you have committed a crime, there should be immunity."[11]

J.W. also responded "yes" to the question, "The testimony of a single witness is sufficient to prove any fact if you believe the witness. Would you require more proof if you believe the witness is telling the truth?" His questionnaire response elaborated, "I need to be sure." He answered "no" to the question, "During deliberations, it is the obligation of every juror to freely discuss the evidence and instructions with other jurors. Will you agree to tell the Court if anyone refused to deliberate with the rest of the jury?" Here, J.W. explained in the questionnaire, "What is said in the room, stays in the room."

In another questionnaire response, J.W. stated that he could set aside his own beliefs and follow the law as the judge gave it to him, even if the instruction was different from a belief

---

[10] Here and elsewhere in this opinion, we will in most instances repeat verbatim statements appearing in written documents such as juror questionnaires and letters, without making spelling or grammatical corrections.

[11] It may be that J.W. intended to add the word "no" before "immunity," but failed to do so.

or opinion that he held. When asked if there was "any reason why [he] would prefer not to serve as a juror in this case," J.W. responded, "no." He also responded "no" to the question, "Is there any reason why you would not be a fair and impartial juror for both the prosecution and the defense in this case?"

### ii. Voir Dire

J.W. was questioned by the court and by counsel after he completed his questionnaire.

The trial court first probed J.W. about his willingness to consider certain kinds of evidence. When the court asked why he answered "no" to the question, "Can you set aside any sympathy, bias, or prejudice you might feel toward any victim, witness, or defendant?" and about his explanation, "[Y]ou need to be honest," J.W. answered, "Oh, probably because of the circumstances as to how the trial is going to be run, whether, you know, if I try to set myself aside and say, okay, I think he's not guilty or he is guilty. [¶] I would have to have a little bit more information as far as what I need to say or what I need to do." When the trial court inquired further and asked if J.W. could base his decision about "what happened" on facts rather than sympathy, bias, or prejudice, J.W. answered, "yes." After the trial court explained that as a juror, J.W. would have to try to evaluate a witness's prior testimony under oath as he would the testimony of a live witness, J.W. said he could do so. And following the trial court's explanation regarding why a witness might be granted immunity from prosecution, J.W. said he had "no problem" with the idea of granting immunity to someone who might then serve as a witness.

The trial court also asked J.W. several questions regarding his views on the death penalty and their potential

bearing on his service as a juror. When asked what he meant by his questionnaire response "an eye for an eye," J.W. answered, "Well, you know, I thought about that question, and I had mixed emotions about it. And I wasn't sure whether I have the right to prosecute a person as an eye for an eye, and, you know, I really didn't know how to answer that question." When the court then inquired if J.W.'s answer meant he would automatically vote for the death penalty if defendant was found guilty of first degree murder, J.W. said, "no." Regarding his "neutral" view toward the death penalty, J.W. said he so responded "because [he] was undecided" when he filled out the questionnaire, but now, "in some of the cases, I — I think a life sentence would be more — more to the liking on my side rather than the death penalty." The court followed up, "So you think instead of like an eye for an eye, you commit murder, you should be executed, you think the opposite? Even if you commit a murder, you should get life without parole?" J.W. answered, "Right." Yet when asked by the court whether, at any penalty phase, he would be "open to considering any aggravating and mitigating circumstances, the good and the bad things about the defendant . . . in making that decision" regarding sentencing or whether he was "locked in to the decision of life without parole," J.W. answered that he could make a fair decision either way, depending on the evidence.

When the trial court asked about J.W.'s questionnaire response indicating that he felt obligated to accept the principle that "[o]nly God has the right" to take a life, J.W. responded, "At the time I answered that question, I had my mind fixed, but as it turns out, if I were in the same predicament, I would want — I would want to be tried fairly . . . ." When the trial court asked J.W. to clarify what he was saying, J.W., repeated, "Well, if

I was facing the same predicament and there was someone in the jury, I would want him to judge me fairly." When the trial court asked what the relationship was between the sentencing decision and being tried fairly, J.W. replied, "If it's a death penalty, I deserve to have death penalty, but if there's some circumstances in there that says, well, maybe I wasn't totally within my own faculty, you know, when I did something, then I'm sorry I did it, but I did it anyway."

After the court turned the questioning over to counsel, J.W. responded affirmatively to questions by defense counsel asking whether he would be open-minded to both sentencing possibilities at a penalty phase, whether he could follow the court's instructions at a penalty phase, whether he could evaluate defendant's "background for what it is, make an honest decision about it," and whether he could be fair at both phases of the trial.

When it was the prosecution's turn to pose questions, J.W. was asked, "Do you think, given all of your views about God and not liking to sit in judgment of people, that you can be a juror in this case?" J.W. responded, "Now that I think of it, yeah, I could. We'll all be judged some time, and we'll be judged." Upon being requested to repeat his answer, J.W. said, "At some time in our life or after life, we'll all be judged, so if I make — if I make a mistake now, I would be judged for it, but I will be forgiven, okay? [¶] So now if I — if I said yes, I can abide by the death penalty and then again I could say yes parole without the or — I could honestly make an honest judgment at that time knowing that what I say I may be forgiven for, whether I make the wrong choice or not." The prosecutor asked, "[A]re you going to be concerned when you go in the jury room though that you're going to be forgiven when it's your time for judgment?" J.W.

answered, "Uh-huh." The prosecutor followed up, "Are you going to be worried about the fact that in your beliefs that it's the wrong decision?" J.W. replied, "No, no, I won't be." In response to a similar question asking whether he could return a penalty phase verdict of death, J.W. responded, "If all the circumstances — now that I think about it, with all the circumstances, if it pointed in that direction, yeah, I could." J.W. provided a similar response when the prosecutor asked whether he would be able to look at the defendant and his family in court and say that defendant deserves the death penalty.

The prosecutor challenged J.W. for cause at the close of voir dire. She argued, "I know what he said here he thinks he could do it . . . but throughout his paperwork he indicated there is no way he could do it." The prosecutor added that she felt from J.W.'s responses during voir dire that he was answering questions in a manner "he thought would keep him on" the jury.[12] Defense counsel disagreed, stressing J.W.'s repeated averments that he could be fair and could return a death verdict.

The trial court allowed the challenge for cause and dismissed J.W. from service. The court believed that J.W. had "never explained to [him]" what wanting to be tried fairly meant, adding, "The problem is he lists in the wind. He's got in the questionnaire as far as the penalty is concerned 'an eye for an eye,' which would suggest you commit the crime of murder, you are to be executed. [¶] On the other side, he says only God can take a life. Then I've tried to clarify which it is, one extreme or

_____

[12] Although not directly referenced by the prosecutor in making this argument, the record suggests that during voir dire J.W. answered some questions in the affirmative even before the attorney finished asking them.

the other, and he has not made it clear which one it is. [¶] His statement that he can be fair isn't the final conclusion. [¶] He is also so inexact in his answers. When he says to the question, 'Can you set aside sympathy, bias or prejudice, you need to be honest,' and I asked him what the heck that means, and he doesn't give a valid answer to any of these questions. [¶] I think he's disqualified both on the general circumstances of the answers that he's given and on his penalty phase answers, and I will allow the challenge."

### b. *Analysis*

Substantial evidence supports the excusal of J.W. for cause. In light of the conflicts across J.W.'s questionnaire responses and his answers to questions posed to him by the court and counsel, as well as the nature of those answers, it was within the trial court's broad discretion to uphold the prosecution's challenge.

A prospective juror may be dismissed (i.e., excused from service as a juror) for cause. (See Code Civ. Proc., § 228; *People v. Jenkins* (2000) 22 Cal.4th 900, 987–988.) Yet such a dismissal may be based on a juror's personal views regarding capital punishment only if these "views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*).) It is "clear that prospective jurors may not be disqualified from service simply because they object to the death penalty as a general matter" (*People v. Peterson* (2020) 10 Cal.5th 409, 429) or because the prospective juror "might 'impose a higher threshold before concluding that the death penalty is appropriate' " (*id*., at p. 430). The standard for dismissal for cause based on the juror's views regarding the

death penalty is instead whether, "after examining the available evidence, . . . the trial court [is] left with a definite impression that the prospective juror is unable or unwilling to faithfully and impartially follow the law" as instructed by the court. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1066.) This rule accommodates both the principle that a criminal defendant has a "right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause" and the state's "strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. " (*Uttecht v. Brown* (2007) 551 U.S. 1, 9 (*Uttecht*).)

The legal standard for dismissing a prospective juror for cause "does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." (*Witt*, *supra*, 469 U.S. at pp. 424–425; see also *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 607; *People v. Martinez* (2009) 47 Cal.4th 399, 426 ["[j]urors commonly supply conflicting or equivocal responses to questions directed at their potential bias or incapacity to serve"].)

When prospective jurors are questioned in person, a reviewing court considering whether substantial evidence supports a dismissal for cause generally must give deference to

the trial court's determinations. (*Uttecht*, *supra*, 551 U.S. at p. 7.) This deference recognizes that the trial court was "in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." (*Id.*, at p. 9; see also *Witt*, *supra*, 469 U.S. at p. 426 ["deference must be paid to the trial judge who sees and hears the juror"].) As we have explained, " ' " '[a] trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record.' [Citation.]" [Citation.]' [Citation.] For this reason, ' "[o]n review of a trial court's ruling, if the prospective juror's statements are equivocal or conflicting, that court's determination of the person's state of mind is binding. If there is no inconsistency, the reviewing court will uphold the court's ruling if substantial evidence supports it." ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 830; see also *Uttecht*, at p. 7 ["when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State' "].)

With regard to the consequences of an erroneous dismissal of a prospective juror for cause, although " '[t]he general rule is that, absent a showing of prejudice, an erroneous excusal of a prospective juror for cause does not mandate the reversal of judgment' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 866; see also *People v. Carpenter* (1999) 21 Cal.4th 1016, 1037 (*Carpenter*); *People v. Holt* (1997) 15 Cal.4th 619, 656), if the wrongful excusal for cause is premised on a prospective juror's

views regarding the death penalty, a penalty phase verdict of death cannot stand (*Gray v. Mississippi* (1987) 481 U.S. 648, 659).

As previously set forth, J.W. responded "yes" to the questionnaire inquiry, "No matter what the evidence shows, would you refuse to vote for guilt as to first degree murder or refuse to find the special circumstances true in order to keep the case from going to the penalty phase, where death or life in prison without the possibility of parole is decided?" — and "no" to the question, "Given the fact that you have two options available to you, can you see yourself, in the appropriate case, rejecting life imprisonment without the possibility of parole and choosing the death penalty instead?" These responses were suggestive of substantial impairment (see *People v. Capistrano* (2014) 59 Cal.4th 830, 856–857; *People v. Riccardi* (2012) 54 Cal.4th 758, 780–782), but they were also in some tension with other answers J.W. provided within the questionnaire.

The trial court then properly provided for in-person examination of J.W. This questioning delved into topics germane to the ultimate question of substantial impairment. J.W.'s answers to some of these questions could have reinforced concerns imparted by his questionnaire responses insofar as, among other things, they entailed multiple reversals of positions taken in his written answers (such as his affirmative response to the trial court's inquiry, "So you think instead of like an eye for an eye, you commit murder, you should be executed, you think the opposite? Even if you commit a murder, you should get life without parole?"). The trial court could also properly take into account the meandering and inconclusive nature of J.W.'s responses to some of the questions that were posed to him during voir dire. (See *People v. Clark* (2011) 52 Cal.4th 856, 900

36

[finding no error in trial court's ruling that a juror who "gave equivocal, conflicting, nonresponsive, and confusing answers when asked about his ability to set aside his personal views and follow the law," after his questionnaire suggested his beliefs would affect his penalty decision, was substantially impaired]; *Carpenter*, *supra*, 21 Cal.4th at p. 1036.)

Although in the course of voir dire J.W. also asserted that he could be open-minded, follow the court's instructions, and review the evidence fairly, it was appropriate for the trial court to evaluate the credibility of these and J.W.'s other answers. The trial court's comments that J.W. "lists in the wind" and that J.W.'s "statement that he can be fair isn't the final conclusion" convey a critical assessment of the prospective juror's credibility during voir dire, including J.W.'s averments that he could faithfully and fairly apply the law as instructed. Our review of the record leads us to conclude that there was an adequate basis for these credibility calls, and for the trial court's accompanying excusal of J.W. from service, notwithstanding the presence of evidence that, if credited, could have led the trial court to draw different conclusions. Even if J.W.'s impairment was not proved to a degree of absolute certainty, as we noted earlier, that is not the standard that applies here. (See *Witt*, *supra*, 469 U.S. at pp. 424–425.)

At oral argument, defense counsel pressed the position that the trial court conducted inadequate voir dire because it did not directly inquire about J.W.'s "yes" response to the "No matter what the evidence shows" question described above and his "no" response to the "Given the fact that you have two options available to you" question. In light of the significant voir dire that did take place regarding topics germane to J.W.'s impairment, we disagree that such a specific line of questioning

by the trial court was essential. This case is distinguishable from *People v. Woodruff* (2018) 5 Cal.5th 697, *People v. Stewart* (2004) 33 Cal.4th 425, and *People v. Heard* (2003) 31 Cal.4th 946, all of which were cited by counsel at oral argument. In those matters, we found error in the excusal of prospective jurors when the pertinent questionnaire responses indicated only personal opposition to the death penalty (*Woodruff*, at pp. 741–742, 744), similar opposition to or qualms about the death penalty and a belief expressed by the potential jurors that their views toward the death penalty would prevent *or* perhaps (due to the relevant question's phrasing) merely make it very difficult for them to vote to impose such punishment (*Stewart*, at pp. 446–449), or "the view that imprisonment for life without the possibility of parole represents a 'worse' punishment than death" (*Heard*, at p. 964). The situation here is different in important respects. Some of J.W.'s questionnaire responses were more reflective of substantial impairment than the responses in *Woodruff*, *Stewart*, and *Heard* were, and here pertinent voir dire took place that, combined with J.W.'s questionnaire responses, provided an adequate basis upon which to make a credibility determination and a finding of disqualification. In *Woodruff* and *Stewart*, by contrast, no voir dire at all occurred. (*Woodruff*, at p. 742; *Stewart*, at p. 445.) Voir dire did take place in *Heard*, but it "did not provide any indication that [the prospective juror's] views regarding the death penalty would prevent or significantly impair him from following the controlling California law" (*id.*, at p. 964), leaving the record in that case in a fundamentally different state than the record in this matter.

Even though none of our prior cases involves facts identical to those before us, our treatment of the excusal of a

prospective juror in *People v. Phillips* (2000) 22 Cal.4th 226 is at least somewhat instructive. There, the possible juror provided several equivocal responses in his questionnaire, "but he also stated, 'I will not vote to put any one to death.' During voir dire, when asked about this statement, he said, 'I'm trying to get out of it. No, I mean I would do the right thing if I was put on a jury. I would do what the law says and . . . there's just so much a parameter you are going with.'" (*Id.*, at p. 233.) The juror "made a number of other equivocal and contradictory responses, but ultimately responded, 'It would be hard,' when asked whether he 'could ever personally cast your vote to put him to death.'" (*Ibid.*) When the prosecutor challenged the juror for cause, the trial court stated that it "had 'a lot of mixed feelings about him.' It could not 'tell . . . whether he's lying and whether he isn't, really.'" (*Ibid.*) Upon granting the motion, the court said, "'It's just that this man is too far out. Maybe your [defense counsel's] description is correct, he's a kind of a philosophical [H]amlet. But whatever it is he's not a reliable one.'" (*Ibid.*) On appeal, we found no error, reasoning that "[b]ecause the juror's statements were equivocal and conflicting, we defer to the trial court's determination." (*Id.*, at p. 234.)

Our analysis of one of the juror excusals in *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335 (*Bryant*) also provides a useful reference point. A prospective juror in that case stated in her questionnaire that "she did not 'believe in the death penalty,' or that California should have one," that she "would not 'be able to vote for the death penalty on another person if [she] believed, after hearing all the evidence, that the penalty was appropriate,'" and that "she would 'automatically, in every case, regardless of the evidence, vote for life in prison without the possibility of parole.'" (*Id.*, at p. 401.) According to

the prospective juror, these had been her fixed views for at least 10 years. (*Ibid*.) During voir dire, the juror "stated that she did not want to serve on the jury, but now believed that, despite her religious views, she could vote for the death penalty '[i]f it was required under the law.' Although she initially stated that she did not think she could be a fair juror because of the child victim [in that case], when asked again whether she was biased, she answered, 'Okay, I could be fair.' " (*Ibid*.) The juror later added "that although she still did not believe in the death penalty, she could impose it in light of her 'civic duty,' but would not be 'overjoyed' in doing so." (*Ibid*.) The trial court granted the prosecution's challenge of the prospective juror for cause, finding her in-court statements "simply incredible in light of the decisiveness of the opposite views she had expressed in her questionnaire answers." (*Ibid*.) Again, we found no error, concluding that "[t]he trial court reasonably credited [the prospective juror's] answers demonstrating her impairment," and "[t]he fact that the prospective juror at times claimed she believed she could perform her duties as a juror 'did not prevent the trial court from finding, on the entire record, that [she] nevertheless held views . . . that substantially impaired her ability to serve.' " (*Id*., at p. 402, quoting *People v. Griffin* (2004) 33 Cal.4th 536, 561.)

Acknowledging some differences between this case on the one hand and *Phillips* and *Bryant* on the other, it is nevertheless true that in each matter, the prospective juror gave an array of responses to questions bearing upon his or her ability to serve as a juror, some of which were indicative of substantial impairment. In each case, the trial court engaged in voir dire — indeed, here there was extensive voir dire — to determine whether such impairment existed, and concluded that it did.

Having reviewed the record, we conclude here, as we did in *Phillips* and *Bryant*, that it contains no basis for reversal. Even though some of J.W.'s responses, if credited, indicated an ability to properly discharge the duties of a juror, there was also sufficient evidence of substantial impairment to support a contrary determination. The trial court's ruling being supported by substantial evidence, we reject defendant's claim of error in the excusal of J.W. for cause.[13]

## B. Guilt Phase Issues[14]

### 1. "Other Acts" Evidence

Defendant contends that the trial court committed prejudicial error when it allowed the prosecution to introduce evidence at the guilt phase of trial concerning incidents at the Men's Central Jail, occurring both before and after Tinajero was killed, in which defendant: (1) had, at various times, a sharpened piece of metal, a syringe, a razor blade, and an altered paper clip in his possession; (2) obtained an identifying wristband from an inmate who was leaving the central jail facility by telling its owner he would be beaten if he did not surrender it; (3) was on multiple occasions found traveling

---

[13] Our resolution of this issue makes it unnecessary to decide whether in finding J.W. "disqualified both on the general circumstances of the answers that he's given and on his penalty phase answers," the trial court may have properly dismissed J.W. for cause for reasons unrelated to his views regarding the death penalty.

[14] Insofar as defendant ascribes prejudice at both the guilt and the penalty phases of trial to asserted evidentiary errors occurring at the guilt phase, our opinion addresses his arguments relating to guilt and penalty under this heading, in conformity with the parties' briefing.

within the jail without his wristband, in contravention of jail rules; and (4) escaped from a locked shower area within the jail. Within this same claim of error, defendant also brings a more general challenge to the admission of evidence regarding his contacts with Irma Limas.

Defendant asserts that the admission of this evidence was improper under Evidence Code sections 352 and 1101 and violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution. He characterizes this evidence as unduly prejudicial and irrelevant to any material issue at trial.

We find no reversible error. By neglecting to raise a proper objection before the trial court, defendant failed to preserve his argument insofar as it pertains to the majority of Limas's testimony — which does not implicate Evidence Code section 1101 in any event, and amounted to proper proof of defendant's guilt. As for testimony regarding defendant's procurement of a wristband from another inmate, the incidents in which he was found without his wristband, and his escape from the shower area, all of this evidence was admissible, as the trial court determined, because it tended to show that defendant had sufficient knowledge of how to evade the jail's security measures to allow him to move relatively freely around a supposedly secure jail environment. To the extent that the admissibility of the other evidence described above may be less clear, we conclude that any error by the trial court in allowing its introduction when it did was harmless.

### a. *The Other Acts Evidence Introduced at Trial*

Defendant asserts that evidence regarding the following incidents should have been excluded pursuant to Evidence Code sections 352 and 1101:

*Possession of Contraband*:  The jury heard about three searches of defendant's cell that yielded items defendant was not supposed to have in his possession.  On May 13, 2003, during a routine contraband search of a cell that defendant shared with other inmates, a shank (a metal bar with one end sharpened to a point) was found in a strap on a canvas bag.  The bag was in the area of the cell where defendant was bunking and contained defendant's belongings and letters addressed to him.  A subsequent search of defendant's cell by sheriff's deputies on July 13, 2004 (after Tinajero's killing, by which time defendant was housed in a cell by himself) yielded a syringe and a razor blade that had been removed from its casing.[15]  Finally, on June 17, 2005, an altered paper clip was found in defendant's cell.  Sheriff's deputies testified at the guilt phase that an inmate could manipulate a modified paper clip to remove handcuffs, and the use of paper clips to escape from handcuffs also was the subject of testimony at the penalty phase.

*December 2003 Escape Attempt*:  Luis Montalban testified that while he was incarcerated at the Men's Central Jail in December 2003, defendant approached him and asked him for his wristband.  Montalban had been called to serve as a trusty

---

[15]  When testifying, defendant explained that he had the razor blade to sharpen pencils.  On cross-examination, the prosecutor asked defendant whether the razor and the shank also found in his possession could be used as stabbing weapons; defendant acknowledged that they could.

at an outdoors location in West Hollywood, where he would have significant freedom to move around. When Montalban refused, defendant explained that Montalban would be "regulated" if he did not surrender the wristband. Frightened, Montalban gave his wristband to defendant. Defendant then left the jail in Montalban's place. Defendant's plan was unsuccessful, and he was returned by bus to the Men's Central Jail. At that time, he was found to be wearing Montalban's wristband and had in his possession a card that would allow him to be taken to West Hollywood as a trusty.

This incident also was mentioned both earlier and later in the trial. As previously noted, Irma Limas testified regarding Chingon/Santi's acknowledgment of an unsuccessful escape attempt. And when he took the stand on his own behalf, on cross-examination defendant admitted that he had tried to escape from Men's Central Jail using a wristband procured from Montalban.

*Not Wearing Required Inmate Wristband*: On October 13, 2004, a deputy noticed that defendant was not wearing his identifying wristband, as jail rules required. The deputy who testified to this incident also recalled that defendant had removed his wristband on another occasion a week earlier, at which time he had been told not to remove it again. A month later, on November 5, 2004, a sheriff's deputy preparing inmates to be taken to the showers noticed that defendant was not wearing his wristband. The wristband was later found in defendant's cell.

*Escape from Locked Shower Area*: On July 30, 2005, defendant escaped from a locked shower area in the high security area of the jail. Shortly after deputies left him in the

shower area, defendant was spotted on closed-circuit television running back to his cell. By the time deputies returned, defendant was already in his cell. Defendant was covered with a thick lather from head to toe and had a large red mark across his back. Deputies enlisted another inmate to try to replicate the escape. This inmate managed to get out of the shower area by lathering himself with soap and crawling through an opening within the shower enclosure.

*Limas's Testimony Regarding Her Contacts with Chingon/Santi*: Defendant also argues that the entirety of Limas's testimony regarding her contacts with Chingon/Santi — including, but not limited to her description of Chingon's escape attempt — should have been excluded as inadmissible propensity evidence.

### b. *Procedural Background*

Prior to trial, the prosecution filed a motion in limine in which it requested a ruling regarding the admissibility of evidence pertaining to the December 2003 escape attempt, the discoveries of contraband in defendant's cell, occasions in which defendant was not wearing a wristband while incarcerated, the July 2005 escape from the jail shower, and the November 2004 incident, described *ante*, in which defendant was found to be in possession of pruno. The prosecution argued that this evidence should be admitted "to show [defendant]'s knowledge of the inner-workings of the jail, and that he possessed the opportunity, contrary to lay intuition, to escape from one supposedly secure area of the jail into another, in order to commit the murder." The prosecution further explained that "[t]he issue of opportunity is material and can be expected to be in dispute in this case because it is reasonable to expect that it

would be contrary to the assumption of the average juror that an inmate at Men's Central Jail could move around freely in a secured environment in order to kill another inmate housed in a different area of the jail."[16]

The trial court received written opposition from the defense and heard argument from counsel. The court ruled that the evidence covered by the People's motion was admissible as part of the prosecution's case-in-chief at the guilt phase of trial, except for the incident in which defendant was found in possession of pruno. The trial court regarded the allowable evidence as "probative on the issue of [defendant's] knowledge, his sophistication, the ability to move around the jail and do what was necessary to elude the authorities there." The court agreed with the prosecution that this evidence tended to show defendant's knowledge of jail protocols and how to circumvent them, elaborating that "the lay person is going to think that if you're locked into a jail cell, that's the end of it, you don't get out of that cell, you don't get into someone else's cell that's locked down, just not a possibility. They have to explain how that could happen, and this does explain that."

Before the jurors heard evidence regarding the May 2003 jail cell search — which, aside from Limas's testimony about Chingon/Santi mentioning a prior escape attempt, was the first

---

[16]    The prosecution also asserted in its motion in limine that the December 2003 escape attempt was admissible to help establish defendant's identity as Tinajero's killer. On this subject, the prosecution asserted that Chingon/Santi's reference to an escape attempt in his communications with Limas tended to prove that Limas's correspondent was in fact defendant, and therefore connect defendant to this person's other incriminating statements.

time the jury heard evidence about any of the acts associated with this claim of error — they were instructed by the court as follows: "Let me indicate that with this witness and with other witnesses talking about things that occur in the jail, they're offered only to show the defendant's knowledge of the operations of the jails and the limitations placed on inmates, not to show that he's a person of bad character." The court added that "[t]here may be others as well on this general subject. . . . [¶] It's all limited to showing [defendant's] knowledge of the operation of the jail and the limitations placed on inmates."[17] At the close of the guilt phase, the jury was instructed that the evidence that had been introduced showing that defendant committed crimes other than those for which he was on trial, "if believed, may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining if it tends to show knowledge of jail procedures and rules as well as methods to overcome them." The jury was further instructed that it could not consider this evidence "for any other purpose."

---

[17] A somewhat similar advisement was given to the jury before it heard testimony regarding the July 2004 search of defendant's cell that yielded a syringe and a razor blade. At that time, the trial court told the jury, "Obviously we're going through a number of incidents that don't relate specifically to the homicides charged in Counts 1 and Count 2. This goes to the knowledge of [defendant] of the jail rules and any incidents involving the ability to circumvent those rules."

*c.   Analysis*

*i.   Legal Principles*

Evidence Code section 1101, subdivision (a) provides that, subject to certain exceptions, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."   "Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*)), with permissible purposes including but not limited to proving "motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident" (Evid. Code, § 1101, subd. (b)).

Moreover, "to be admissible such evidence [of uncharged acts also] 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352.' " (*Ewoldt, supra,* 7 Cal.4th at p. 404.)   Evidence Code section 352 authorizes the exclusion of evidence by the trial court when its probative value is "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The "undue prejudice" that Evidence Code section 352 is concerned with " 'is that which " ' "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " ' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 29 (*Chhoun*), italics omitted.)

As conveyed by the text of Evidence Code section 1101, subdivision (b), evidence of misconduct may be admissible to show "knowledge" or "opportunity," among other permissible theories of relevance. Regarding knowledge, "uncharged misconduct evidence might show that a person possesses relatively uncommon knowledge of a thing, technique, or method, and such knowledge makes it somewhat more likely that the person committed the act in question." (Leonard, The New Wigmore a Treatise on Evidence: Evidence of Other Misconduct and Similar Events (2019) § 6.5, p. 464; see also *People v. Felix* (2019) 41 Cal.App.5th 177, 185–186; cf. *U.S. v. Blitz* (9th Cir. 1998) 151 F.3d 1002, 1008 (*Blitz*) [construing rule 404 of the Fed. Rules Evid. (28 U.S.C.)]; *U.S. v. Barrett* (1st Cir. 1976) 539 F.2d 244, 248 [same].) We also have recognized circumstances in which evidence was properly admitted to show opportunity. In *People v. Thomas* (1992) 2 Cal.4th 489, we determined that testimony that the defendant, charged with murder, claimed to enjoy sneaking up on people was not made inadmissible by Evidence Code section 1101, reasoning that this evidence "demonstrated that defendant had the ability to surprise the victims" and given that "[t]he manner in which the killer came into contact with the victims was unknown . . . [,] that defendant was capable of doing so without their awareness was certainly relevant to show opportunity." (*Id.*, at p. 520.)

We apply an abuse of discretion standard when reviewing a ruling on an objection under Evidence Code sections 352 and 1101. (*Chhoun*, *supra*, 11 Cal.5th at pp. 26, 27.) A ruling subject to this standard of review "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a

manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

### ii. Application

At the outset, we reject defendant's argument that Limas's testimony regarding her contacts with Chingon/Santi should have been excluded as improper propensity evidence. As the People observe, most of Limas's testimony discussing her interactions with Santi, including Santi's interest in locating "Raul," is not "other acts" evidence subject to exclusion under Evidence Code section 1101, subdivision (a). Whether understood as " 'intrinsic' " evidence regarding motive and identity (3 Jones on Evidence (7th ed. 2022) § 17:13) or otherwise, this testimony was relevant to defendant's guilt and cannot reasonably be regarded as proscribed proof of criminal propensity.

Defendant's failure to raise an appropriate objection before the trial court to the entirety of Limas's testimony also makes defendant's misunderstanding regarding Evidence Code section 1101's scope largely academic. At most, defendant preserved an objection to that portion of Limas's testimony in which she recounted Santi's statement that he had tried to escape from the jail facility.

Concerning that statement, we conclude that the trial court did not abuse its discretion in allowing the prosecution to offer evidence regarding defendant's acquisition of Montalban's wristband by means of threat, the instances in which defendant was found without his wristband, and the July 2005 escape from the jail shower. As the trial court concluded, these episodes were probative of defendant's knowledge regarding how to exploit weaknesses in jail security to move relatively freely

around the jail.  Even though, as defendant emphasizes, these incidents were not factually identical to the circumstances surrounding Tinajero's killing (with the proof at trial tending to show that defendant had obtained a court pass from another inmate to gain access to Tinajero's module and cell), they were nonetheless relevant to how defendant could have made his way from his cell to an entirely different cell module in order to kill Tinajero.  This evidence tended to prove that defendant knew that jail protocols for keeping inmates in their proper places could be outmaneuvered and that he had the know-how to take advantage of these lapses.

Meanwhile, the probative value of this evidence was not substantially outweighed by a probability of undue prejudice to defendant or another countervailing consideration.  (Evid. Code, § 352.)  The evidence regarding defendant's acquisition of a wristband from another inmate, his failure to wear his assigned wristband on other occasions, and his escape from the shower was not likely to provoke the sort of emotional response that Evidence Code section 352 is concerned with.  Furthermore, the testimony concerning these incidents was relatively brief, and the testimony was not likely to distract the jury by focusing its attention on ancillary issues, particularly in light of the limiting instructions given by the court.  We therefore perceive no abuse of discretion in the trial court's ruling as it pertained to this evidence.[18]

---

[18]  Although the trial court did not explain that it had conducted an Evidence Code section 352 balancing analysis prior to authorizing the introduction of this evidence, it did reference section 352 in explaining why the evidence of

Defendant argues that because he was found without a wristband and escaped from the locked showed area *after* the Tinajero killing, these particular incidents did not show he had relevant knowledge at the time of the Tinajero homicide. This contention is contrary to the general rule that "[t]he circumstance that the uncharged [act] occurred *after* the charged offense does not" necessarily place the uncharged act outside the ambit of Evidence Code section 1101, subdivision (b). (*People v. Balcom* (1994) 7 Cal.4th 414, 425.) In making his argument, defendant relies upon *People v. Hendrix* (2013) 214 Cal.App.4th 216, in which the court stated that "to establish knowledge when that element is akin to absence of mistake, the uncharged events must be sufficiently similar to the circumstances of the charged offense to support the inference that *what defendant learned from the prior experience provided the relevant knowledge in the current offense.*" (*Id.*, at pp. 242–243, italics added.) But *Hendrix* was not concerned with uncharged acts occurring after a charged crime. Both of the uncharged acts offered as evidence in that case occurred prior to the charged offense, and we do not read the analysis in *Hendrix* as expressing a categorical view on the issue defendant raises.

Furthermore, we perceive no reason to adopt a strict rule that evidence showing a person possesses pertinent knowledge at some point after the charged crime can never shed light on whether the person had the same or similar knowledge at some earlier date. In this case, a juror could plausibly infer from each

defendant's possession of pruno would be excluded. This mention allows for an inference that the court engaged in the necessary weighing when considering the other evidence entailed by the People's motion. (*People v. Harris* (2013) 57 Cal.4th 804, 845.)

of the described incidents that defendant had material knowledge regarding how to exploit weaknesses in jail security at the time Tinajero was killed. (Accord, *Blitz, supra*, 151 F.3d at p. 1008 ["when the evidence of other acts is offered to prove knowledge, the other acts need not be similar to the charged acts as long they ' "tend to make the existence of the defendant's knowledge more probable than it would be without the evidence" ' "].) This inference is least compelling with regard to defendant's escape from the shower area because of the factual differences between this incident and the circumstances around Tinajero's homicide, as well as the time lag between the two events. But it was still within the court's discretion to conclude that this incident, involving an escape from a supposedly secure area of the jail, tended to prove that defendant knew how to circumvent the jail's security measures when Tinajero was killed in April 2004, and that the passage of time and other differences between the two occasions went to the weight that could reasonably be attached to the shower escape in showing defendant's knowledge at the time of the killing.

It is less clear that the evidence that defendant possessed a shank, razor blade, syringe, and an altered paper clip should have been admitted at the guilt phase of trial. As compared to the incidents involving escapes and defendant's violation of the jail's wristband protocols, these incidents had a significantly more attenuated relationship with the question of how defendant could have moved about the jail to commit the Tinajero murder. Yet even if we were to assume that this evidence should not have been admitted at the guilt phase, any assumed error in this respect is properly regarded as harmless. In light of the powerful evidence of defendant's culpability of the crimes and enhancements alleged against him — not least his

confessions and the well-corroborated eyewitness testimony offered at trial — and the marginal nature of this proof in connection with the guilt determination (the prosecutor not even deigning to mention defendant's possession of contraband in her guilt phase closing statement), it is not reasonably probable that a different result would have obtained at that phase of trial had this evidence not been offered as proof. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)[19]

Insofar as defendant also asserts harm at the penalty phase from the assertedly erroneous introduction of this evidence at the guilt phase, his claim of prejudice fares no better. A trial error under state law will be regarded as prejudicial at the penalty phase if "there is a reasonable (i.e., realistic) possibility that the jury would have rendered a different verdict had the error or errors not occurred." (*People v. Brown* (1988) 46 Cal.3d 432, 448 (*Brown*).) This standard is " 'the same in substance and effect' " (*People v. Gonzalez* (2006) 38 Cal.4th 932, 961) as the standard for assessing the prejudicial effect of federal constitutional error, which considers "whether the error is harmless beyond a reasonable doubt" (*ibid.*, citing *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)). " 'When evidence has been erroneously received at the penalty phase, this court should reverse the death sentence if it is "the sort of

_____

[19] Contrary to defendant's assertions, any error in the admission of this evidence at the guilt phase of trial "was not of such gravity as to amount to a denial of [defendant's] 'due process right to a fair trial, an impartial jury, and a reliable penalty determination guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.' " (*People v. Thomas* (2011) 52 Cal.4th 336, 356; see also *People v. Partida* (2005) 37 Cal.4th 428, 439.)

evidence that is likely to have a significant impact on the jury's evaluation of whether defendant should live or die." ' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 917.)

We perceive no reversible error under this standard. First, evidence regarding defendant's possession of a shank, syringe, and razor blade in jail was a *proper* subject of the jury's consideration at the penalty phase. Possession of these instruments in jail constitutes a crime involving an implied threat of force or violence within the meaning of section 190.3, factor (b). (§ 4502, subd. (a); *People v. Delgado* (2017) 2 Cal.5th 544, 585–586 (*Delgado*); *People v. Landry* (2016) 2 Cal.5th 52, 118–119 [razor blade]; *People v. Lucky* (1988) 45 Cal.3d 259, 292 [shanks]; *People v. Wallace* (2008) 44 Cal.4th 1032, 1082 [" 'mere possession of a potentially dangerous weapon in custody involves an implied threat of violence' "].)[20] Well before trial began, the prosecution signaled its intent to rely upon evidence that defendant had possessed weapons while in jail as an aggravating factor at the penalty phase. Furthermore, the jurors were instructed at the conclusion of the penalty phase that defendant's possession of a weapon in jail could be considered as an aggravating circumstance only if proved

---

[20] With regard to the syringe, the deputy who found it in defendant's cell testified that it was approximately two and a half inches long, with a needle that was slightly more than half an inch in length. According to the deputy, the syringe could be used to inject drugs or as a weapon. Photographs of the syringe were introduced as exhibits, allowing us to assess its appearance. We are satisfied from the foregoing that there was a sufficient basis for the jury at the penalty phase to consider defendant's possession of the syringe as a possible violation of section 4502, subdivision (a). (See *People v. Hughes* (2002) 27 Cal.4th 287, 383; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 589.)

beyond a reasonable doubt. The foregoing facts establish that there was no meaningful penalty phase error as to this evidence. This evidence was *properly* considered by the jury in making the penalty determination, even if it was prematurely introduced at the guilt phase of trial. (Cf. *People v. Marks* (2003) 31 Cal.4th 197, 226; *People v. Smith* (2003) 30 Cal.4th 581, 613 ["The challenged evidence [introduced at the guilt phase] would clearly have been admissible at the penalty phase even if not at the guilt phase [citation], thus obviating any possible prejudice at that phase"].)[21]

---

[21] Defendant also argues that "[b]ecause the trial court erred in admitting the other-acts evidence, the jury improperly was permitted to consider it at the penalty phase under [section 190.3,] factor (a)," the aggravating circumstance providing for consideration of "[t]he circumstances of the crime of which the defendant was convicted" in determining the appropriate penalty. (§ 190.3, factor (a); see *People v. Blair* (2005) 36 Cal.4th 686, 749 ["The 'circumstances of the crime' as used in section 190.3, factor (a), 'does not mean merely the immediate temporal and spatial circumstances of the crime. Rather it extends to "[t]hat which surrounds materially, morally, or logically" the crime' "].) We do not believe it reasonably possible that any error in admitting other acts evidence at the guilt phase of trial prejudiced defendant by allowing jurors to assign undue weight to these incidents at the penalty phase. The jury was carefully instructed concerning how it could consider this evidence at the close of both the guilt and the penalty phases, being told at the guilt phase that these incidents could be considered only insofar as they might bear upon defendant's knowledge of jail protocols and how to evade them, and being allowed to consider these incidents at the penalty phase as aggravating factor (b) evidence, if proved beyond a reasonable doubt. Even if we were to assume for sake of argument that the jury also regarded these discrete acts as "circumstances of the crime" under section

That leaves only an assumed error in the introduction of testimony that an altered paper clip was found in defendant's cell more than a year after the Tinajero murder occurred. Unlike the evidence that defendant possessed a shank, razor blade, and syringe in jail, this evidence was not admissible at the penalty phase under section 190.3, factor (b). (*People v. Lancaster* (2007) 41 Cal.4th 50, 93–94 [a defendant's possession of a makeshift handcuff key in jail does not automatically qualify as factor (b) evidence].) Yet we do not perceive a reasonable possibility of a different result had this evidence not been introduced. (See *People v. Mills* (2010) 48 Cal.4th 158, 208–209; *Brown, supra*, 46 Cal.3d at p. 448.) True: evidence at the guilt phase that defendant had been found in possession of the altered paper clip may have informed the presentation of penalty phase testimony regarding prisoners' use of distorted clips to escape from handcuffs, and the prosecutor did comment upon defendant's possession of the altered clip during her closing argument at that latter phase of trial. But no evidence was introduced that defendant in fact knew how to escape from handcuffs using an altered paper clip or that he had done so. Furthermore, the trial court did not include defendant's possession of a paper clip in its recitation of the factor (b) evidence that could function as an aggravating circumstance. Finally, insofar as the evidence regarding an altered paper clip contributed to the prosecutor's argument regarding defendant's possible future dangerousness in prison, other, properly admitted evidence — including evidence detailing the

190.3, factor (a), and assume further that this was impermissible, there is no reason to believe the jury accorded such weight to them within the parameters of *that* aggravating circumstance as to prejudice defendant under any standard.

circumstances surrounding the Tinajero homicide itself — went to that same point, and far more powerfully. In light of the other evidence before the jury, it is clear beyond any reasonable doubt that defendant's possession of an altered paper clip did not impact the outcome at the penalty phase. We conclude that defendant was not prejudiced at any phase of trial by any possible error in the admission of this evidence.

### 2. Evidence Regarding Gang Activity and Defendant's Gang Membership

Defendant also challenges the introduction of evidence regarding his gang membership and gang activity at the Men's Central Jail. He asserts that this evidence was inadmissible under Evidence Code sections 352 and 1101 and that its introduction violated his constitutional rights to due process, a reliable penalty determination, and a fundamentally fair jury. We find this argument forfeited as to some of the evidence involved and, in any event, meritless.

### a. The Gang Evidence Introduced at Trial

The testimony and exhibits that defendant focuses upon with this contention represent a subset of the gang evidence that was introduced at trial, which will be discussed at some length below to provide context to defendant's claim of error.

### i. Initial Testimony

The subject of gangs or gang activity at the jail initially arose during the defense's cross-examination of Anthony Sloan, the prosecution's first witness concerning the Tinajero killing. During this cross-examination, Sloan testified that he had been a trusty in the gang module at the Men's Central Jail and had been transferred from the gang module to the module where

Tinajero was housed.[22] When defense counsel asked if "there is going to be a hit in the jail or there's going to be fighting, that the gang module is usually the individuals who carry it out, individuals in the gang module?" Sloan answered in the affirmative. Sloan also agreed with counsel's inquiry whether, as a trusty in the gang module, he "took kites [messages] from different members of that module" and "did things for them." Sloan testified further regarding gang activity at the jail during redirect examination and recross-examination, without any objection under Evidence Code sections 352 or 1101 from either the prosecution or the defense. For example, in the course of recross-examination, defense counsel asked, "[W]hen prison hits

---

[22]     Possibly foreshadowing an argument that Tinajero's cellmates had killed him while administering gang-sanctioned retribution, the opening statement by defense counsel had noted, "Mr. Tinajero was what's known in the jail as a rat or a snitch, and when you are a rat and a snitch in the jail, there is some liability, there is some danger based on that. [¶] I think the evidence will show Mr. Tinajero was placed in a cell with what, four other convicted felons . . . . He wasn't a keep away, at least from the other four convicted felons, and he ends up dead in the cell. That's not that strange when you are a rat or a snitch in jail."

Later, in his closing statement at the guilt phase, defense counsel argued, "[I]f there's going to be discipline issued out, it might come from state prison, it might come from high power, but it goes through the gang module. They are the enforcers." Describing Tinajero's cellmates, counsel said, "and what do these guys, where do they work? What a coincidence. What a coincidence. They are trusties in the gang module." The defense further argued to the jury that Tinajero's death "wasn't planned as a hit, a murder. It was planned as a regulation that went too far, it got out of hand."

are done . . . doesn't high power basically send the order down to the gang module?" Sloan professed not to know.

Additional testimony regarding gang activity and gang influence at the jail was elicited by both the prosecution and the defense in the subsequent examination of Matthew Good, without any contemporaneous objection under section 352 or section 1101 of the Evidence Code. Good testified on direct examination that he did not intervene when defendant was attacking Tinajero because "it's one of those jail things where I don't know where this came from," meaning "it could be people higher up on the chain, people that are affiliated in there that are saying take care of this guy." On cross-examination, Good agreed with defense counsel that, for the most part, orders from "high power" went to the jail's gang module to be carried out.

The testimony that defendant casts as objectionable began with Limas's subsequent testimony about the letter she had received from her correspondent that was signed, "Santiago Pineda Hernandez Chingon." In questioning Limas, the prosecutor observed that "up here in the letter it says, 'From the big bad ass ES Wilmas.'" The defense objected that the letter "speaks for itself"; the court overruled this objection. The prosecutor continued, "East Side, ES Wilmas Ghost Town Locos, is that correct?" Limas answered in the affirmative. A few questions and answers later, the prosecutor asked, "And what's ES, do you know?" Limas answered, "East Side." The prosecutor followed up by asking, "Who called themselves East Side Wilmas?" The defense objected on the ground that an inadequate foundation had been laid. Before the court could rule on the objection, Limas answered, "It's a gang." The court then overruled the objection, and Limas repeated her answer.

After Limas left the stand, other witnesses testified that the phrases "El Chingon" and "ES Wilmas" were written in the notebook found in defendant's clothing after Tinajero's killing, and that transcripts of Tinajero's testimony and a police report regarding defendant's arrest also had been found in the cell. Regarding the transcripts and report, a sheriff's deputy testified (over a defense objection that this testimony lacked a sufficient foundation, which the trial court overruled) that this paperwork could be used to "shut the other guy [referring to a witness] up" and "get other people involved." Following up on the deputy's reference to targeted inmates being subject to a "green light," on cross-examination defense counsel inquired, "So if an inmate has a green light, any other inmate in the jail would have the okay to do something to that inmate?" The deputy responded, "Generally with the green lighters, we're talking about Hispanic gang member inmates, yes." Later in the course of cross-examination, defense counsel returned to the subject, asking, "Once a person is on the green light, is he basically subject to attack by any gang member?" to which the deputy answered, "Yes, any Hispanic gang member." Additionally, Deputy Torres testified that defendant had told him he had secured permission to kill Tinajero by showing the inmate who ran the 2000 floor the proper "paperwork." Again, there were no objections under Evidence Code sections 352 or 1101 to any of this testimony.[23]

---

[23] Defense counsel also asked Luis Montalban, who had testified that defendant had obtained his jail-issued wristband from him by means of threat, whether he (Montalban) was a "Southsider"; Montalban answered in the affirmative.

### ii. Deputy Clift's Testimony

Deputy Clift testified after the presentation of the previously described evidence. Before Clift took the stand, the prosecutor characterized him as a gang expert whose testimony would respond to the apparent defense theory that Tinajero's cellmates, and not defendant, had been responsible for Tinajero's death. The prosecutor explained that "the defense has been trying to imply that it was the four guys living in the cell that killed Tinajero instead of [defendant]. He'll explain why that would not be." The trial court observed in response, "This isn't a case involving gang activity specifically, but the relevance of gangs is present to the extent that as we've heard some of the testimony, [defendant] received items, apparently clothing as well as wrist bands apparently through the use of threats of gang retaliation or group retaliation if an individual didn't give it up, so it is relevant." The court added, however, that it "want[ed] to be cautious about the use of gang testimony because the California Supreme Court said it's highly prejudicial." The defense did not object to Clift's anticipated testimony at that time.

Before the jury, Clift testified that based on his experience within the jails and jail culture, in his opinion Tinajero's white cellmates would not have harmed Tinajero. A defense objection to this testimony as lacking an adequate foundation was overruled. The court did grant a defense motion to strike Clift's answer to a follow-up question posed by the prosecutor, in which Clift explained that he premised his opinion on information he had received regarding the inmates' criminal histories. At a sidebar discussion, the judge explained he had thought the prosecution had called Clift to show that "whites are not aligned with the Hispanic gangs and would not carry out a hit for the

Hispanic gangs," which the court described as a more "generic thing" than going through "these individuals' backgrounds and [saying] he knows that they wouldn't commit a crime." The jury was instructed to disregard Clift's testimony that his opinion was premised on information he had received regarding the inmates' backgrounds.

A hearing was then conducted outside of the jury's presence. (See Evid. Code, § 402.) At this session, the prosecutor posed questions to Clift regarding the basis for his opinion that Tinajero's cellmates would not have killed him. Clift explained that his opinion was premised on the cellmates' backgrounds and on the fact that the victim was a Sureño gang member who was testifying against another Sureño gang member, a situation that Clift cast as "gang business" that Tinajero's cellmates would not have been involved in. The defense argued that Clift's testimony on this topic was inadmissible because "for a person to get up and say this person didn't do it but inferentially the other person did it" would violate defendant's right to a jury trial. The prosecutor responded that Clift's testimony was appropriate because, "for the defense to be able to just get up there and say it was the four guys in the cell that did it probably . . . for the jury to understand why that probably didn't happen, [Clift is] not saying it's a hundred percent certainty, he's saying based on his expert opinion, it is highly unlikely that these individuals would have committed this crime because they're not part of the politics, and . . . it is probative and enlightening to this jury who doesn't know anything about . . . the jail culture or the prison culture."

The trial court sustained the defense objection "to that testimony," reiterating that "[t]he thing I thought we were going

at was that the whites would not — the normal gang associations are such that whites would not carry out contracts to kill on behalf of the Hispanic gangs, but if that's not the case, then there is no relevance to the testimony." The prosecutor agreed to limit Clift's testimony in conformity with the court's ruling. After a discussion of other matters, the conversation returned to Clift's anticipated testimony. The prosecutor represented that she would ask Clift about the likelihood of nongang members carrying out "Sureno business"; whether, based on the content of letters defendant authored, he believed defendant was a Sureño gang member; whether there was a green light on Tinajero; whether permission was needed in jail to conduct a hit; and whether it was unusual for Sureños to carry out Sureño "business," including their "own" business, among other topics of inquiry. The defense replied that this proffer "seems to be the same old issue revisited again, trying to do indirectly what [the prosecutor] cannot do directly." Defense counsel continued, "I believe the People have tried to create an issue of gangs where it does not exist. There is no — we have not introduced any testimony at this point to show that this was a gang hit. The People have invented this issue, and now they're trying to go further and call an expert to say it was not a gang killing, and I would submit it." The prosecutor responded that the defense had opened the door to this evidence by inquiring about a gang module in the jail and whether hits went through that module. The court overruled the defense objection.

Resuming his testimony before the jury, Clift testified that nongang members would not carry out a hit on a cellmate because "they don't get involved in the political aspect or the business of the gangs." According to Clift, an inmate's status as a trusty in the jail's gang module did not mean that he would do

"business" for the Sureño gang, including killing a snitch, "because they're not involved in the business," "can't be trusted," and "a lot of them don't want to get involved." Over a defense objection on relevance grounds, which the court overruled, Clift testified that based on the contents of a letter Limas had previously described as well as another letter from defendant that Clift had intercepted, in his opinion defendant was part of the Sureño gang. Clift regarded it as unlikely that an individual who was not a member of the Sureño gang would carry out a hit, even if that person hung out with the gang. But he did not believe it would be unusual for somebody who was a member of the Sureño gang "to take care of their own business." Clift agreed with counsel's assertion that within the jail there was a hierarchy of inmates who controlled the "power" within the institution. It also would not be unusual, in Clift's opinion, for someone interested in performing a "hit" on an inmate housed in a jail module to go to the inmate in charge of that module to secure permission first, and having "paperwork" on someone was significant because "if a gang member goes out and hurts another gang member, he has to have a reason for it . . . so what he'll do, if he gets questioned by other gang members, he can always reveal this paperwork and show it to them and say, look, this person talked to law enforcement."

A break in the proceedings occurred shortly thereafter. During the break, defense counsel moved for a mistrial, arguing that the prosecution "did indirectly what the court had prohibited them from doing directly." Counsel added that he thought "the relevancy of this testimony is very remote and it should be stricken under [Evidence Code section] 352 at least." The trial court denied the motion, stating, "[T]he issue of gang activity is peripherally involved in this case, unfortunately, but

65

also is consistent with earlier information we had that [defendant] had received permission from or approval from, I was going to say shot callers, but other individuals in the — that had some control over the jail to carry out the hit, so that has to be explained as well."

After further direct examination and cross-examination, on redirect examination Clift testified that "the jail rules with the Sureno [are] if you're a snitch, it's automatic you will be killed," with Clift agreeing with the prosecutor's statement that "in a case where you have an inmate who testified against another, nobody is going to be told to regulate them, it's going to be kill if an order did in fact go down." He further testified that although trusties not enrolled in a gang might be enlisted to perform favors for Sureño gang members, "as far as ordering a non Sureno to do a hit, that's not going to happen" because "[t]hey cannot trust them to keep their mouth shut or to complete the operation." On recross-examination, Clift testified that "[g]reen light lists [come] from the shot callers of the jail, and it's got to be approved, and before you attack someone, before you regulate anyone, you have to call and verify to make sure that that person should still be on the green light list. You have to upgrade it."

*iii. Cross-examination of Defendant*

The prosecution also inquired into defendant's gang affiliation when he testified on his own behalf at the guilt phase.

On direct examination, defendant denied being a Sureño gang member, testifying that he had only "associate[d]" with the Wilmas. He explained that the Sureños were a prison gang and admitted only people who had served time in prison. Prior to her cross-examination of defendant, the prosecutor advised the

trial court and defense counsel that she planned on questioning defendant about a statement he had made — "I ride for the Sur, one for all" — in one of the letters Clift had intercepted. This letter, dated September 26, 2006, was directed toward a female inmate, Della Rose Santos. Defense counsel stated, "Obviously we oppose that line of questioning on the letter itself . . . the letter, I don't believe that was mentioned in direct." The court overruled the objection, finding the letter relevant to impeach defendant's testimony.

In her cross-examination of defendant, the prosecutor read a portion of the letter providing, "Grumpy told me about that guera that turned over the dime. Their treating him bad but that will be straighten out soon we ride for the sur tu sabes babe, 'one for all, all for one.' "[24] When asked to explain this text, defendant denied that "we ride for the sur" meant he was a Sureño gang member. He testified, "When you're in jail, you can only go — you have certain choices who to run with, and that's the Southside, so a Southside runs with the Surenos, but the Surenos is only a prison gang, not an L.A. County jail gang." On further cross-examination, defendant admitted that he "claimed" membership in the Ghost Town Locos clique of the East Side Wilmas street gang. Asked again specifically about the statement within the letter, "we ride for the sur," defendant explained, "[S]ince there's different people you run with in jail, you have to go along with what happens."

---

[24] At the penalty phase, Clift would testify that although "guera" means "light-skinned or light hair" in Spanish, in this context the word was used to refer "to Grumpy's partner as a sissy or a bitch for snitching him off."

### b. Analysis

"The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*Chhoun, supra,* 11 Cal.5th at p. 31.) "Evidence of the defendant's gang affiliation — including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like — can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).) But "admission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged" (*People v. Williams* (1997) 16 Cal.4th 153, 193), and "[t]rial courts should carefully scrutinize" such evidence (*People v. Melendez* (2016) 2 Cal.5th 1, 28 (*Melendez*)). We review a trial court's ruling allowing the presentation of such evidence for an abuse of discretion. (*Id.*, at p. 29.)

### i. Limas's Testimony

We conclude that defendant forfeited any argument that Limas's testimony regarding the East Side Wilmas should have been excluded by the trial court under Evidence Code section 352 or 1101. Defendant did not raise a timely objection to Limas's testimony on these grounds. Although defendant did object to Limas's testimony regarding the meaning of "East Side Wilmas" as lacking a sufficient foundation, this objection did not preserve the distinct argument that her testimony was inadmissible under Evidence Code section 352 or 1101. (See *People v. Valdez* (2012) 55 Cal.4th 82, 137–138 (*Valdez*) [objections that testimony was irrelevant and lacked an

adequate foundation did not preserve argument on appeal that evidence was inadmissible under Evid. Code, § 352]; *People v. Demetrulias* (2006) 39 Cal.4th 1, 19–21 (*Demetrulias*) [trial objections that evidence was irrelevant, speculative, and lacked a proper foundation did not preserve argument that evidence was inadmissible under Evid. Code, § 1101].)

Defendant asserts that before trial began, he raised an adequate objection to the introduction of gang evidence as unduly prejudicial. This assertion is unfounded. Defendant's argument relies upon a discussion between counsel and the trial court that took place during the development of the jury questionnaire. At that time, the prosecutor observed that the draft questionnaire asked prospective jurors about gangs, and opined that this questioning was appropriate because of the contents of the notebook found in defendant's clothing and a witness (presumably Limas) who would testify at trial to statements made to her by someone who identified himself as "Chingon" from a "Wilmas" gang clique. Defense counsel responded, "Your honor, I would strongly disagree with the People with respect to this being a gang case. . . . And I don't believe any references to gangs should be made. [¶] Gangs is very prejudicial, and the identification I believe by . . . the operative witness is established by her familiarity with the person that was speaking to her, and gangs doesn't — gangs is only prejudicial."

The court then stated, "The only reason it would be in the questionnaire is to make sure that the jury is not overwhelmed emotionally by gang evidence of whatever kind that comes in." After some additional back-and-forth, defense counsel said, "I believe the People should make an offer of proof as to why Wilmas and Chingon is important," leading the prosecutor to

explain how these words were connected to defendant in various ways.  The court then said it would leave questions about gangs out of the questionnaire if that was what the defense wanted. Defense counsel replied, "Yes.  That would be my request that it be left out.  [¶]  And before the People call the witness, perhaps we can have [an Evidence Code section] 402 hearing . . . with respect to that issue."  To which the court responded, "Sure.  But you're assuming for this position that she's [referring to the prosecutor] going to get that evidence in," which defense counsel agreed he was, "[a]nd in that case you don't want the questions [about gangs] in the questionnaire."  Defense counsel confirmed that he did not want those questions included.  The conversation then turned to other subjects.

Counsel's comments during the preparation of the jury questionnaire did not amount to an objection under section 352 or section 1101 of the Evidence Code (or on any other basis) to the presentation of evidence regarding gangs at trial.  Defense counsel's statement that he did not "believe any references to gangs should be made," in that setting, raised a concern regarding the contents of the jury questionnaire.  With regard to the presentation of gang evidence at trial, counsel merely suggested the possibility of conducting an evidentiary hearing and neither requested nor received a ruling on the presentation of evidence relating to gangs at the jail — which, it should be noted, was later elicited first by the *defense* at trial.  Under the circumstances, the dialogue regarding the jury questionnaire neither presented nor preserved a claim that the court should

have kept gang evidence from the jury pursuant to Evidence Code section 352 or 1101.[25]

Even if there had been a timely objection to Limas's testimony under Evidence Code section 352 or 1101, which there was not, the trial court would not have abused its discretion by overruling it. Limas's testimony identifying "ES Wilmas" as a gang helped explain why this otherwise cryptic phrase might have been found in both correspondence addressed to her and in the notebook found in defendant's cell, and on that basis provided additional proof that Santi/Chingon was in fact defendant. (See *People v. Booker* (2011) 51 Cal.4th 141, 171 [a "defendant's plea of not guilty put[s] all elements of each offense at issue"].) More significantly (particularly in light of what the People correctly characterize as "overwhelming" proof that defendant and Santi/Chingon were one and the same), evidence of defendant's gang affiliation provided a reason why he might have been authorized to kill Tinajero — someone who had snitched on a gang member — in a jailhouse environment where, as testimony elicited by both the defense and the

---

[25] Defendant also argues that his failure to raise a contemporaneous objection to Limas's testimony under Evidence Code sections 352 and 1101 should be excused because in reading from defendant's letter, the prosecutor had already put objectionable content before the jury, and because Limas described the ES Wilmas as a gang before the trial court ruled on the defense's foundational objection. But timely objections to this evidence as unduly prejudicial and as improper proof of propensity were still necessary to preserve defendant's arguments on appeal. If these objections had been deemed meritorious, the trial court could have stricken any objectionable testimony from the record and instructed the jury to disregard the disputed questions and answers. (See, e.g., *Melendez, supra,* 2 Cal.5th at p. 33.)

prosecution tended to show, gangs exerted significant influence over whether, how, and by whom violence could be employed. Given the relevance of Limas's testimony on these points, its brevity, and the other surrounding circumstances (including the evidence that already had been introduced at trial regarding gang activity at the jail), we would not find error even if defendant had presented his contentions to the trial court.[26]

### ii. Clift's Testimony

We assume that defendant has preserved his argument challenging Clift's testimony as inadmissible under Evidence Code section 352, but we conclude he did not preserve his claim of error under Evidence Code section 1101. (See *Valdez*, *supra*, 55 Cal.4th at p. 130 [objections before the trial court that evidence was "irrelevant, cumulative, lacking in foundation, or prejudicial" did not preserve a claim on appeal that the evidence was inadmissible under Evid. Code, § 1101]; *People v. Doolin*

---

[26] It is unclear whether defendant also attacks the introduction of evidence relating to gangs that was proffered through witnesses other than Limas who testified before Clift took the stand and the defense made its first recognizable objection to the introduction of gang evidence as unduly prejudicial. Were we to assume that defendant challenges the admission of this evidence, too, we would conclude that any appellate attack on this testimony as inadmissible under Evidence Code section 352 or 1101 has been forfeited due to defendant's failure to register a timely and specific objection before the trial court that would preserve his arguments on appeal. Additionally, much of this evidence was elicited by the defense or responsive to testimony elicited by the defense, and in any event, the trial court would not have abused its discretion in overruling an objection or objections under Evidence Code section 352 or 1101, due to this relevance of this evidence in fleshing out the gang dynamics at the Men's Central Jail and their bearing upon the Tinajero killing.

(2009) 45 Cal.4th 390, 437 [a trial objection under Evid. Code, § 352 failed to preserve an objection under Evid. Code, § 1101 for purposes of appeal].) Ultimately, defendant's claim of error under Evidence Code section 352 is unpersuasive, as would be any argument under Evidence Code section 1101, had it been preserved.

As detailed in the foregoing summary of the evidence introduced at trial, Clift took the stand only after the jury had heard extensive testimony regarding gang activity at the Men's Central Jail. Some of this testimony was elicited by the defense, in line with a theory that Tinajero had been killed by his cellmates incident to a gang-ordered "regulation" that went too far. In this vein, defense questioning of Good and Sloan had insinuated that Tinajero had been killed, intentionally or accidentally, by his cellmates at the direction of a jailhouse gang.

In this context, Clift's testimony was relevant to explain why the pertinent gang dynamics at the jail made it more, rather than less, likely that defendant had killed Tinajero. Clift's testimony that a "hit" on a snitch would need the approval of gang authorities within the jail; that inmates who were not members of a gang would not be tasked with performing a hit, but a gang member with the proper "paperwork" would be allowed to take care of his own "business"; and that defendant was, in his opinion, a gang member all was relevant to and probative regarding the central contested issue surrounding the Tinajero killing, namely, whether defendant or Tinajero's cellmates were responsible for Tinajero's death.

What is more, in light of all relevant circumstances, the probative value of this evidence in these respects was not

substantially outweighed by a probability of undue prejudice from the jury hearing about gang culture in jail and defendant's relationship with gangs. Defendant calls out Clift's identification of him as a gang member as particularly prejudicial. But by the time Clift testified, the jury already had heard from Limas about the "ES Wilmas" notation in a letter connected to defendant. Moreover, placed in context, defendant's gang membership did not evoke the sort of raw " ' " ' "emotional bias against the defendant as an individual" ' " ' " that might lead to an unjust outcome at trial. (*Chhoun*, *supra*, 11 Cal.5th at p. 29.) It instead served the more technical purpose of explaining how the gang bureaucracy at the jail might have sanctioned retribution against Tinajero by a fellow gang member. We find no abuse of discretion in allowing Clift to testify as he did.[27]

### iii. Cross-examination of Defendant

Lastly, defendant has forfeited any claim on appeal that the prosecution ran afoul of Evidence Code section 352 or 1101 by cross-examining him regarding his gang membership. As with his challenge to Limas's testimony, defendant did not raise a contemporaneous objection at trial that this cross-examination was improper under these provisions. Neither counsel's position against including any mention of gangs in the jury questionnaire, nor his objection to cross-examination regarding

---

[27] Moreover, the prosecutor only briefly touched upon the gang evidence in her closing statement at the guilt phase. It was the defense that more extensively invoked the gang angle, describing Clift's testimony as "very valuable" in its closing statement and characterizing it and other evidence regarding gangs as supportive of the defense theory of Tinajero's death as a gang-authorized regulation "that went too far."

the letter defendant wrote to Limas on the ground that it was outside the scope of direct examination, can reasonably be understood as raising such an objection. And contrary to defendant's assertion, his failure to raise a timely objection cannot be excused because it would have been futile in light of the trial court's previous rulings regarding the admissibility of gang testimony; on the contrary, given the different evidence and circumstances associated with those rulings, "[t]he record in the present case does not establish any basis to excuse the defense's failure to object." (*People v. Redd* (2010) 48 Cal.4th 691, 729, fn. 18.)[28]

---

[28]   Earlier, during the prosecution's case-in-chief, the parties had briefed and presented argument regarding the admissibility of the letter discussing "Grumpy" and the "guera." But this discourse concerned the letter's admissibility as section 190.3, factor (b) evidence at the *penalty phase* of trial. At the time, before defendant took the stand in his defense, the prosecution did not seek to rely upon the letter at the guilt phase.

In its briefing regarding the admissibility of the letter, the defense did identify Evidence Code sections 352 and 1101 as grounds for exclusion. The trial court subsequently observed that defendant's reliance on Evidence Code section 1101 in this briefing was misplaced because the issue before the court was limited to the letter's admissibility at the penalty phase, however, and defense counsel did not dispute this assessment.

Under the circumstances, defendant's subsequent decision to testify at the guilt phase made it incumbent on the defense to alert the trial court that defendant was maintaining an objection under Evidence Code sections 352 and 1101 to the use of the letter for impeachment purposes on cross-examination during the guilt phase defense case. (See *People v. Morris* (1991) 53 Cal.3d 152, 190 [to preserve an issue for appeal, a motion in limine is to be "made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context"].)

Were we to assume for sake of argument that defendant did not forfeit his challenge to this cross-examination, we would conclude that there was no error in allowing this inquiry. This examination represented appropriate impeachment of defendant's testimony on direct examination that he was not a Sureño gang member. (*People v. Hopson* (2017) 3 Cal.5th 424, 443 ["It is . . . well established that the prosecution can impeach a testifying defendant, just like any other witness"].)[29]

### 3. Testimony Regarding Defendant's Possession of Shanks

Defendant argues that reversible error occurred at the guilt phase when one of Tinajero's cellmates, Palacol, was allowed to relate a statement by a sheriff's deputy that defendant had possessed shanks in jail. Defendant argues that this statement amounted to inadmissible hearsay and its introduction violated his rights to due process and a reliable penalty determination under the United States and California Constitutions. As described below, we will assume that there was error under state law but find it harmless.

#### a. Facts

Palacol made two identifications of Tinajero's killer shortly after the murder. The first identification involved Palacol being shown only a single photograph, of defendant. The second identification involved six photographs. In questioning

---

[29] Insofar as defendant may be understood to complain that the jury could have relied upon this and other gang evidence for improper purposes absent a limiting instruction by the trial court, this argument has been forfeited by his failure to request such an instruction in the proceedings below. (*Hernandez, supra,* 33 Cal.4th at pp. 1051–1052.)

Palacol about the first identification, the prosecutor showed Palacol a photograph that had been marked as an exhibit and asked him if he recognized it. Palacol said that he did, because a sheriff's deputy had shown it to him. When the prosecutor asked, "What were the circumstances of you being shown that photograph?," Palacol began to answer, "He just, he said that he was having —." At that point defense counsel objected "as to what the deputy said." The prosecutor responded that the statement was "not offered for the truth at this time."

A sidebar conference followed, during which defense counsel advised the court that Palacol would testify that the deputy told him he had been having a problem with the person in the photograph, "catching with him a bunch of shanks or a lot of shanks in the jail." Defense counsel argued that this statement was "highly prejudicial" and "more prejudicial than probative." He also asserted that if the statement was not being offered for the truth of the matter asserted, it was irrelevant. The prosecutor responded that this detail was relevant to "the circumstances of why [Palacol] was shown the photograph and then how he makes the identification as the one in the murder." The prosecutor added that "while I know it may be prejudicial, the court already has ruled we'll be getting into the fact he's had shanks in jail," so "it's not like evidence they're not going to have," making the prejudicial effect only "minimal." The court overruled the defense objection.

The prosecutor then resumed her examination of Palacol, asking, "When the deputy was showing you this photograph, what were the circumstances for why he was showing it to you? What did he say?" Palacol answered, "He said he was having trouble with this person finding shanks and stuff on him, and he just showed it to me and asked me if that was the guy that

was in [my] cell that did that," referring to the homicide. Palacol told the deputy that it was.

### b. *Analysis*

Defendant argues that the trial court should have excluded the deputy's statement regarding defendant's possession of shanks because it was hearsay (see Evid. Code, § 1200), irrelevant, and subject to exclusion under Evidence Code section 352. Defendant further contends that jurors would not have applied the limiting instructions that were given to them regarding his violations of jail rules, described earlier in this opinion, as extending to this reference of him possessing shanks, meaning that the jury could have relied on the deputy's statement to infer that defendant had a criminal disposition.

In arguing that there was no error, the People assert that "[h]ad the prosecutor not asked Palacol about the circumstances surrounding the deputy's inquiry, the jury would have been left to wonder why the deputy showed Palacol only that one photograph of appellant, rather than presenting him with a photographic lineup as the detectives later did. This would have fueled a defense argument that the single photograph show-up was a suggestive identification that tainted Palacol's subsequent six-photograph identification. . . . [¶] But because the trial court overruled appellant's objection, the jury was able to hear testimony suggesting the purpose of the deputy's inquiry was not to investigate the murder, but rather to follow up on a far less serious rule violation by appellant."

The People's explanation is unpersuasive. It is clear that the purpose of both identifications was to pinpoint Tinajero's killer, not to investigate past incidents involving the possession of shanks. Insofar as it could more plausibly be asserted that

the deputy showed Palacol defendant's photograph when investigating the Tinajero killing *because* defendant had previously possessed a shank, that theory of admissibility squarely implicates the hearsay issue identified by the defense.[30] And even apart from the hearsay question, if evidence that a shank, syringe, and razor blade were found in defendant's cell was inadmissible at the guilt phase (as allowed for earlier in our opinion), this assessment would have collateral consequences for the Evidence Code section 352 calculus applicable to the deputy's statement.

Any error in allowing Palacol to recite the deputy's statement was incontestably harmless, however. As previously explained in addressing defendant's claim that the trial court should not have allowed the jury to hear evidence that he possessed shanks and other potential weapons while in jail, it is not reasonably probable that defendant would have obtained a more favorable result at the guilt phase had this evidence not been presented. (*Watson, supra*, 46 Cal.2d at p. 836.)[31] It is also farfetched that the jury would have used this fleeting reference to defendant's possession of shanks as a basis for inferring a criminal propensity given that it was instructed early on by the trial court that evidence regarding "things that occur in jail" was

---

[30] The People do not attempt to justify the presentation of the disputed statement on the ground that, although hearsay, it fell within an exception to the hearsay rule.

[31] As with the other testimony regarding defendant's possession of contraband in jail, discussed *ante*, there is no reason to regard any mistake in allowing Palacol to testify regarding the deputy's statement as being of such a magnitude that it violated defendant's constitutional rights to a fundamentally fair trial and a reliable penalty determination.

admissible only for the limited purpose of showing defendant's knowledge, and "not to show that he's a person of bad character," and was reminded in closing instructions that evidence that defendant committed crimes other than those for which he was on trial could be considered only for a limited purpose, and not "to prove that the defendant is a person of bad character or that he has a disposition to commit crimes." In light of these considerations, as well as the compelling evidence of defendant's guilt offered at trial, it is not reasonably probable that any mistake in allowing Palacol to recite the deputy's statement prejudiced defendant at the guilt phase.[32] We also perceive no possible effect on the penalty phase result, particularly because, as has been discussed, evidence that defendant possessed a shank (among other potential weapons) was admissible at that stage of trial as section 190.3, factor (b) evidence. Even if admitted in error, it is clear beyond a reasonable doubt that the reference that Palacol testified to did not meaningfully affect the body of evidence relied upon by the jury in deciding the appropriate penalty or how this evidence was considered by the jury.

---

[32] Additionally, we note that in overruling a hearsay objection raised by the defense during the testimony of the first witness to take the stand at the guilt phase, the court instructed the jury that "when I allow a statement by other than a witness while testifying, . . . it is not to prove the truth of the content, it is only to show information that the individual received, and then that might explain their conduct after that, but it does not prove that what that individual heard was true."

## C. Penalty Phase Issues

### 1. *Testimony Regarding Defendant's Participation in Mutual Combat*

Defendant asserts error in the introduction of evidence at the penalty phase that he was involved in a 2002 fight at the jail. He argues that this evidence constituted inadmissible hearsay and that its admission violated his constitutional rights to confront witnesses against him (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) and a reliable penalty determination. We again assume error but find it harmless.

#### a. *Facts*

Prior to the trial, the prosecution provided notice that it intended to offer section 190.3, factor (b) evidence that defendant had been involved in "mutual combat" at the Men's Central Jail. Before the penalty phase commenced, defendant objected to this incident on the basis that it did not involve criminal activity and therefore could not be admitted under factor (b). The trial court overruled the objection.

At the penalty phase, the People called Sheriff's Deputy Patrick Morean as its sole witness regarding the incident. Morean testified that while on duty at the Men's Central Jail on June 30, 2002, he was alerted to a fight in a large communal dayroom. When Morean arrived in the dayroom, he encountered other deputies who "had already been interviewing and separating all of the inmates that were involved." As Morean began to repeat what another deputy at the scene had told him, defense counsel objected to "any hearsay." This objection was sustained. Defense counsel objected, again successfully, on the same ground when the prosecutor asked Deputy Morean whether he had obtained any information regarding who started

the fight. Trying a different tack, the prosecutor then asked Morean — without objection — whether he had obtained information about who had started the fight. Morean said that he had. The prosecutor then inquired whether Morean made any observations regarding defendant's possible involvement in the fight. Morean replied that he noticed defendant had redness on both his left and his right knuckles and scratches on his back. Morean wrote a disciplinary report concerning defendant's involvement in the incident.

On cross-examination, Morean testified that he did not see the physical altercation take place and he did not know who the first aggressor was. When Morean responded to the incident, "everyone was being separated and interviewed at that time." He also explained that fights among inmates were very common at the jail.

Commencing redirect examination, the prosecutor asked Morean whether he had information that defendant was not the victim. This question was met with another hearsay objection by the defense. In the sidebar conference that ensued, defense counsel stated that he was "planning to ask the court to strike the entirety of this officer's testimony because it appears from the direct examination and cross-examination he had no firsthand knowledge of the incident nor does he have a present memory of that particular incident" and "renew[ed]" his "motion to strike for lack of firsthand knowledge." Counsel also argued that the People were attempting to "bootleg hearsay information into evidence through this officer." The court denied the motion "as to what he's testified to," observing that Morean "is a witness to the injuries on the defendant," but sustained the hearsay objection.

Responding to a rephrased question from the prosecutor, Morean testified that he would not have written a report on defendant had he possessed information that defendant was the victim in the incident. The defense initially objected to this exchange, but after saying, "Object," counsel advised the court that he would "let the answer stay." In subsequent recross-examination, Morean reiterated he did not personally observe any fight and testified that "all of [his] information is what [he] heard from someone else except for what [he] physically saw on [defendant's] knuckles and back." After eliciting this testimony, defense counsel stated, "there would be a motion," which the trial court denied.

### b. *Analysis*

To repeat, among the factors to be considered at the penalty phase of a capital case is "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).) "Criminal activity," in this context, means "the commission of an actual crime, specifically, the violation of a penal statute." (*People v. Phillips* (1985) 41 Cal.3d 29, 72.) Although the criminal activity need not have led to a conviction, the evidence nonetheless "must be sufficient to 'allow a rational trier of fact to find the existence of such activity beyond a reasonable doubt.'" (*People v. Jackson* (2014) 58 Cal.4th 724, 759 (*Jackson*).)

"[T]he proper admission of evidence under [section 190.3,] factor (b) is not based on the abstract, definitional nature of the offense, but on the conduct it involves." (*Delgado*, *supra*, 2 Cal.5th at p. 583; see also *People v. Thomas*, *supra*, 52 Cal.4th at p. 363.) " ' " '[A] trial court's decision to admit "other crimes"

evidence at the penalty phase is reviewed for abuse of discretion, and no abuse of discretion will be found where, in fact, the evidence in question was legally sufficient.' " ' " (*Delgado*, at p. 582.) " '[A]ny hypothetical juror whom the prosecution's evidence might not have convinced beyond a reasonable doubt must be presumed to have followed the court's instruction to disregard the evidence' " if not adequately proved when, as is the case here, an appropriate instruction to this effect was given by the trial court. (*Id.*, at p. 588; see also *People v. Tully* (2012) 54 Cal.4th 952, 1027 ["Whether the other crimes evidence is significant enough to be given weight in the penalty determination is a question for the jury"].)[33]

" ' "[W]here the prosecution's evidence shows a jailhouse scuffle, the scene as witnessed does not suggest defendant may have been acting in self-defense, and defendant presents no evidence in mitigation, a finding of criminal assault is justified." ' " (*Jackson, supra*, 58 Cal.4th at p. 760.) Defendant

---

[33] Regarding the consideration of section 190.3, factor (b) evidence at the penalty phase, the jury here was instructed, "Evidence has been introduced for the purpose of showing that the defendant has committed the following criminal acts which involve the express or implied use of force or violence or the threat of force or violence: physical assaults and threats against guards, possession of weapons, an attempted escape by violence, refusing to comply with guards' orders where compliance would reduce danger to the guards, a fight with another inmate, creating a disturbance which endangered another inmate, and sending threatening letters. Before a juror may consider any criminal acts as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit the criminal acts. A juror may not consider any evidence of any other criminal acts as an aggravating circumstance."

argues that Morean had insufficient firsthand knowledge of any fight that would support the 2002 incident's admission under factor (b), however. He asserts that "[u]nless it were placed in context by the use of inadmissible hearsay evidence, the admissible evidence — namely, Morean's testimony that he observed redness on the left and right knuckles of appellant's hands and scratches on his back . . . — would have had no evidentiary value; the jury would be able to infer that appellant had engaged in an act involving force or violence only by indulging in speculation."

The People respond that defendant forfeited this argument by failing to timely object to Morean's testimony, at the outset of direct examination, that he had been alerted to a fight in the dayroom. (See *People v. Perry* (1972) 7 Cal.3d 756, 781.) The People reason that this testimony was received without objection, and neither the defense's subsequently sustained hearsay objections, counsel's comment at sidebar during redirect examination that he "was planning to ask the court to strike the entirety of [Morean's] testimony," nor counsel's statement at the close of recross-examination that "there would be a motion" gave the court timely and appropriate notice that this testimony should be stricken. (See *People v. Caritativo* (1956) 46 Cal.2d 68, 73 ["The rule is settled that where a [party] deliberately permits evidence to be given without objection in the first instance and then moves to strike it out on grounds readily available at the time the evidence was offered, [the party] waives such objections to the reception of the evidence"]; *King v. Haney* (1873) 46 Cal. 560, 563; cf. *Rose v. State* (1942) 19 Cal.2d 713, 742 [an overbroad motion to strike is properly denied].) Defendant retorts that his initial hearsay objection, although interposed a few questions after Morean

first testified to the alert of a fight in the dayroom, "related to any, which is to say, *all . . .* hearsay testimony by Deputy Morean, and therefore operated to challenge the admission of his testimony that a fight had occurred in the day room." Defendant further argues that trial counsel's other protests before the trial court also functioned as hearsay and confrontation clause objections to this and other portions of Morean's testimony.

Defendant may well have the better of this argument. It is nonetheless unnecessary for us to decide the forfeiture question. Instead we may assume that the issue has been preserved and further assume error, because it is clear that any mistake in admitting Morean's testimony was harmless under the standard articulated in *Brown*, *supra*, 46 Cal.3d at page 448 and *Chapman*, *supra*, 386 U.S. at page 24. Even if were we to assume an error or errors that weakened or fundamentally compromised the proof regarding the dayroom incident as section 190.3, factor (b) evidence, in determining whether to sentence defendant to life without the possibility of parole or death, the jury could not have attached much significance to defendant's participation in a jailhouse scuffle occurring almost two years before he committed the far more serious offense of murdering Tinajero. The circumstances of the charged crimes and other properly admitted evidence of defendant's criminal conduct involving force, violence, or the threat of force or violence undoubtedly loomed far larger in the jury's mind when deciding upon the proper penalty. Therefore, even assuming that defendant preserved his claim of error and that this claim has merit, we find no basis for reversal.

## 2. *Admission of Other Factor (b) Evidence*

Defendant argues that the trial court should have excluded other evidence admitted under section 190.3, factor (b) at the penalty phase and that its failure to do so constituted error under the death penalty statute and violated his state and federal constitutional rights to due process, a fair trial by an impartial jury, equal protection, and a reliable penalty determination, as well as the constitutional bans on cruel and unusual punishment. (U.S. Const., 6th, 8th, & 14th Amends; Cal. Const., art. §§ 1, 7, 15, 16 & 17.) The discussion below addresses this evidence in the sequence it was introduced at that stage of trial.[34]

### a. *Disobeying Order*

Defendant argues that the trial court erred in allowing the prosecution to introduce evidence of an altercation with a deputy sheriff at the jail. On December 7, 2004, Deputy Jason Argandona was retrieving defendant from the court line and escorting him back to his jail module. Defendant was in handcuffs with a waist chain at the time. Argandona noticed that defendant had something in his hands and was attempting to conceal it in his waistband. Concerned that defendant might be hiding a weapon, Argandona asked defendant to show his

---

[34] Insofar as this claim also renews and extends defendant's challenge to the admission of evidence regarding his possession of an altered paper clip to capture additional testimony offered at the penalty phase regarding the use of paper clips to escape from handcuffs, these arguments (assuming they have been preserved) fail for the reasons given earlier in this opinion. As has been explained, it is clear beyond a reasonable doubt that evidence regarding defendant's possession of an altered paper clip and how distorted paper clips can be used as handcuff keys did not affect the outcome at the penalty phase.

hands and what he was holding. Defendant did not comply. Instead, he grasped the object and lowered his center of gravity, so that he "sort of ducked down and turned away" from Argandona. Argandona initially described this as "a defensive stance or possibly an offensive stance" and replied in the affirmative when the prosecutor asked whether it "might" be described as "like a fighting stance." Argandona grabbed defendant and placed him against the wall. Defendant responded by calling him names. Argandona removed the object from defendant's front waistband. It turned out to be a bag of potato chips. Defendant, having lost his canteen privileges, was not supposed to have this item in his possession.

Defendant argues that this evidence was inadmissible at the penalty phase because the incident described by Argandona did not involve a crime involving force, violence, or the threat of force or violence. The People respond that the evidence made out a violation of section 148 — which prohibits resisting, delaying, or obstructing a peace officer in the lawful performance of the officer's duties — involving an implied threat of violence.

We need not decide whether Argandona's testimony qualified as proper section 190.3, factor (b) evidence because defendant failed to raise a sufficient objection before the trial court, forfeiting his claim of error on appeal. " 'If the accused thinks evidence on any . . . discrete crime [introduced as evidence in aggravation at the penalty phase] is too insubstantial for jury consideration, he should be obliged in general terms to object, or to move to exclude or strike the evidence, on that ground.' " (*People v. Turner* (2020) 10 Cal.5th 786, 827 (*Turner*); see also *People v. Montiel* (1993) 5 Cal.4th 877, 928, fn. 23.) One way to register such an objection is

through a motion in limine. " '[A] motion *in limine* to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfies the basic requirements of Evidence Code section 353, i.e.: (1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context.' " (*People v. Rowland* (1992) 4 Cal.4th 238, 264, fn. 3.)

Here, defendant did not object to this evidence when it was introduced at trial or request that Argandona's testimony be stricken from the record. Regarding a motion in limine, prior to the penalty phase, the defense objected to "some of" the incidents the People had identified as potential section 190.3, factor (b) evidence. But the defense did not adequately communicate that this objection was directed toward the incident that Argandona testified to. Having failed to raise a sufficiently specific objection to this evidence and there being no reasonable basis for us to conclude that an objection would have been futile, it is plain that defendant forfeited any challenge to the admission of this testimony, and we decline to address the merits of defendant's claim of error.[35]

---

[35]    In any event, the introduction of this evidence could not have prejudiced defendant under any standard, whether viewed in isolation or in relation to the rest of the evidence offered at trial.

### b. *Evidence That Defendant Threatened Another Inmate*

Later in the penalty phase, Deputy Andrew Cruz testified that on June 7, 2005, as he prepared to handcuff defendant in advance of a court appearance, he heard defendant yelling, "Fuck you, Benji," and "You're a rat" at another inmate. Cruz testified that the inmate being addressed had provided some information to deputies and that if someone is labeled a rat or a snitch, "it's almost like a death wish," because "when other inmates find out that [an inmate] is a rat, most inmates are assaulted." Based on his training and experience, Cruz believed what defendant had said placed the other inmate's well-being in danger. When Cruz told defendant to stop, defendant did not comply. He persisted and "incited the other inmates on the row as well to begin calling [Benji] a rat," creating what Cruz regarded as an officer safety issue. When defendant was handcuffed and escorted off the floor, the other inmates on the row continued to yell, "Benji is a rat." On cross-examination, Cruz acknowledged that although Benji had provided some deputy personnel with information, he did not know what that information entailed.

After Cruz was excused from the stand, defense counsel asked the court to instruct the jury to ignore his testimony on the ground that defendant's conduct, as testified to, was not a crime. The prosecutor replied that defendant's conduct amounted to intimidation of a witness, citing sections 136.1, 137, 139, and 140. The court denied defendant's request, explaining, "[I]t calls for extreme measures for the person to be called a rat. It doesn't have to be true, may not have said anything, but any inmate who hears that is likely to attack the person in custody in a situation where he can't defend himself."

On appeal, defendant renews his argument that the jury should not have been allowed to consider Cruz's testimony as section 190.3, factor (b) evidence because defendant's conduct did not amount to a crime. Concerning section 140, defendant argues that "[o]n its face, [defendant's] statement that 'Benji is a rat' did not express a 'serious expression of an intent to commit an act of unlawful violence.' " Instead, he argues, "[A]t most, the statement expressed scorn or contempt for snitches. Indeed, the statement evinces no intent to *do* anything whatsoever. This is especially true of any statements [defendant] made after he was handcuffed." In making this argument, defendant relies upon our decision in *People v. Lowery* (2011) 52 Cal.4th 419, 427 (*Lowery*), in which this " 'serious expression' " language appears.[36]

The People regard defendant as having forfeited his argument that this evidence was erroneously admitted. The People also assert that this evidence comported with section 190.3, factor (b) because a juror reasonably could have found that defendant's conduct was " 'a serious expression of an intent to commit an act of unlawful violence.' " (*Lowery, supra,* 52 Cal.4th at p. 427.) In the alternative, the People argue that any error was harmless.

Unlike the situation with Argandona's testimony, to which the defense never specifically objected, here the defense asked the court to instruct the jury to disregard Cruz's testimony after

---

[36] Defendant does not argue on appeal that section 140 requires a closer connection between the information provided by a witness and the actual or attempted commission of a crime than was shown by the evidence introduced below. We therefore have no occasion to construe the statute's precise parameters in this respect.

he was excused from the stand. We assume that this request to strike preserved defendant's claim of error (see *Turner, supra,* 10 Cal.5th at p. 827) and proceed to consider — and reject — the claim on the merits.

Section 140 applies when a person "willfully uses force or threatens to use force or violence upon the person of a witness to, or a victim of, a crime or any other person . . . because the witness, victim, or other person has provided any assistance or information to a law enforcement officer, or to a public prosecutor in a criminal proceeding or juvenile court proceeding." (*Id.,* subd. (a).) "The acts proscribed in section 140 . . . take place because the witness, victim, or informant has provided information or assistance to a law enforcement officer. The statute is retrospective rather than prospective and proscribes acts which are retaliatory rather than acts to intimidate." (*People v. McDaniel* (1994) 22 Cal.App.4th 278, 284, italics omitted.) This crime does not require "that the defendant act with a specific intent to intimidate the particular victim," nor that the threat be communicated to the witness or informant. (*Lowery, supra,* 52 Cal.4th at p. 426.) Nor does the statute require an immediate capacity to carry out the threat. (*Id.,* at p. 428.) But it does penalize only "those threatening statements that a reasonable listener would understand, in light of the context and surrounding circumstances, to constitute a true threat, namely, 'a serious expression of an intent to commit an act of unlawful violence' (*Virginia v. Black* [(2003)] 538 U.S. [343,] 359), rather than an expression of jest or frustration." (*Id.,* at p. 427.)

We conclude that defendant's testified-to conduct — yelling, "You're a rat" to a fellow inmate, refusing to stop when ordered to do so, and instead continuing and inciting other

inmates to join him in chanting "Benji is a rat" — could indeed have been regarded as " 'a serious expression of an intent to commit an act of unlawful violence' " (*Lowery*, *supra*, 52 Cal.4th at p. 427) against Benji for having provided assistance or information to sheriff's deputies at the jail.

To understand whether a statement reasonably would be understood as a threat, one must take into account all relevant surrounding circumstances. (See *In re George T.* (2004) 33 Cal.4th 620, 637–638 [construing § 422]; *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340 (*Mendoza*) [same]; *Planned Parenthood v. Amer. Coalition of Life* (9th Cir. 2002) 290 F.3d 1058, 1079 ["without context, a burning cross or dead rat mean nothing"].) Accounting for these facts, a juror reasonably could have found beyond a reasonable doubt that defendant's persistent chanting of "Benji is a rat," including his refusal to stop after being ordered to do so and his involvement of other inmates, conveyed a seriousness of purpose to inflict future harm. (Cf. *People v. Jurado* (2006) 38 Cal.4th 72, 136 [§ 190.3, factor (b) evidence that the defendant loudly referred to another inmate as a " 'snitch' " in front of other prisoners, with the inmate subsequently being assaulted, sufficient to show culpability for aiding and abetting an assault]; *Burns v. Martuscello* (2d Cir. 2018) 890 F.3d 77, 91 [it is "well understood that inmates known to be snitches are widely reviled within the correctional system," and "a number of courts have found an Eighth Amendment violation where a guard publicly labels an inmate as a snitch, because of the likelihood that the inmate will suffer great violence at the hands of fellow prisoners"].) Although defendant did not explicitly declare that he or anyone else would harm Benji, "rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its

ambience would render [threat statutes] powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat." (*U.S. v. Malik* (2d Cir. 1994) 16 F.3d 45, 50; see also *Mendoza, supra,* 59 Cal.App.4th at pp. 1340, 1341 [upholding conviction under § 422 where defendant's statement to victim that " 'you fucked up my brother's testimony. I'm going to talk to some guys from Happy Town' " reasonably could have been construed, in context, as "a threat to bring a person to the attention of a criminal street gang as someone who has 'ratted' on a fellow gang member"].)

Because the jury reasonably could have found beyond a reasonable doubt that defendant manifested " 'a serious expression of an intent to commit an act of unlawful violence' [citation], rather than an expression of jest or frustration" (*Lowery, supra*, 52 Cal.4th at p. 427), defendant's claim of error fails.

### c.   *Defendant's Letter to Della Rose Santos*

During the penalty phase, the prosecution's gang expert, Clift, was called back to the stand to testify regarding the September 2006 letter to Della Rose Santos, including the portion of the letter that stated, "Oh, yeah, Grumpy told me about that guera that turned over the dime. Their treating him bad but that will be straighten out soon we ride for the sur tu sabes babe, 'one for all, all for one.' " The letter was signed, "Chingon," followed by a set of symbols (three dots and two slash

lines).[37] The prosecution argued that this letter was admissible as section 190.3, factor (b) evidence at the penalty phase because it evinced a threat against a witness. (§ 140.) After hearing argument from the parties, the trial court allowed the prosecution to offer portions of the letter, as interpreted by Clift, as section 190.3, factor (b) evidence.

In his testimony, Clift explained that "Grumpy" was the street name of another gang member who was incarcerated on a murder charge, and who was housed on the same cell row as defendant. Clift interpreted the letter as saying that the "guera" had snitched or ratted on Grumpy, that Grumpy had been locked down and isolated from the general population, and that the person who had snitched on Grumpy would soon "be taken care of," meaning that the person would be either killed or assaulted. Clift further testified that defendant was "offering up his services to help" with the assault or killing, "whether he does it himself or he assists in committing the murder or passes the word on to other people that would get this so-called snitch." According to Clift, the symbols appearing next to "Chingon" in the letter's closing signified the Mexican Mafia, explaining that "whenever a Sureno gang member . . . . believes in the Mexican Mafia's philosophies, they will identify their gang with the No. 13," which the symbols reflected.

---

[37] When he was cross-examined at the guilt phase of trial, defendant acknowledged writing the letter and explained that Grumpy was his friend and neighbor in jail, who was in custody on a murder charge. He testified that the reference in the letter to something being "straighten[ed] out" meant that "we were going to talk to the cops to leave him alone because they were beating him up."

We agree with the People that Clift's testimony concerning the letter, and the letter itself, were properly admitted as section 190.3, factor (b) evidence because the letter could have been construed as threatening a witness, as prohibited by section 140. Defendant argues that, contrary to Clift's interpretation, the letter is most reasonably interpreted not as a " 'serious expression of an intent to commit an act of unlawful violence' " (*Lowery*, *supra*, 52 Cal.4th at p. 427), but instead as merely, in defendant's words, "an accurate comment on the 'guera's' predicament:  he had snitched, and for that reason he was now in danger at the hands of virtually any [Sureño] member with whom he came in contact."  As the People argue, a juror could have reasonably found otherwise with the requisite conviction. Even though the portion of the letter providing, "Oh, yeah, Grumpy told me about that guera that turned over the dime. Their treating him bad but that will be straighten out soon" does not expressly vow any personal involvement by defendant, the accompanying statement, "we ride for the sur tu sabes babe, 'one for all, all for one' " suggests that defendant *would* be personally involved in threatening or committing violence against the informant.  There was no error in submitting this incident to the jury as a crime involving a threat of violence captured by section 190.3, factor (b).

### d.  *Defendant's Letter to Ursula Gomez*

On January 8, 2007, during a break in the presentation of the defense case at the penalty phase, the prosecutor advised the court that jail staff had intercepted more letters authored by defendant.  The prosecutor explained that defendant had tried to smuggle these letters through his legal mail the previous week, only to have them seized by authorities.  One of these letters was addressed to a state prison inmate named Ursula

Gomez; another to an inmate named Robert De La Cruz. The People requested permission to present these letters, and the circumstances surrounding their seizure, as evidence in its rebuttal presentation at the penalty phase. The defense objected, arguing that these letters did not involve a crime of violence and therefore did not represent valid section 190.3, factor (b) evidence.

The trial court ruled that portions of these letters involved threats prohibited under section 140 and were for that reason admissible as section 190.3, factor (b) evidence. Regarding the letter to Gomez, the trial court also noted that "[p]art of this is rebuttal to the evidence that was offered in the defense, that he actually has been given ethics training by the family. That was one of the justifications." The trial court also allowed the prosecution to show that the letters were seized as smuggled mail, explaining, "We've gone into a lot of what has happened in the county jail, and that's why I'm allowing the defense to go into the circumstances of his confinement if he gets an LWOP [life without the possibility of parole] sentence from the jury, and so this is part of an exploration of that issue. Is he going to . . . — present a future danger if he's in LWOP custody, whatever that turns out to be."

Clift was recalled to the stand to testify regarding the letters. Sections of the letter to Gomez were redacted and not put before the jury. Unredacted parts of the letter provided, "News papers have been making me a celebrity. Not that I don't like it I love publicity. Choww! I'll be handin out autographs so no mas pide si gustas ya que asta las estrellas te doy ati mija. Ha! Ha! I'm a lifer wacha and still feel like a million bucks! . . . [¶] I'm a dedicated Sureno to the fullest and death and through out my life style I stood for mines. When I got torcido I cut old

97

boy loose and put on the zapatos to fight it myself. But el destino had plans for him you know the rest. [¶] Pa mi no me importa if it's a guy or girl that has to be cut loose in times like these you weigh things whoever has more weight stays and the less weight que se eche aperder. But some people do not have the balls to say, 'Sabes, I got this go ahead and take off.' Once the trial is over the loose one better look out. I don't know much about the situation but if homie was sunk and according to what I heard a while back homie in deed should have stood up and taken that step further on his own. Pero eso se require los que me sobran! And no you ain't wrong in. . . . [¶] The D.A. is a joke I was laughing through out my trial. All them compliments from her and the judge, serio, both kept saying I'm a smart motherfucker and that's why I should get death to stop anything in the future they assume I'll do up state. Again all lies I'm just a lil guy trying to survive. [Here appeared a drawing of a smiling face, winking.] . . . [¶] Okay and can you go, say, from 505 to 508? Or B yard to C or D yard? Then that means you could see and talk to hinas from B, C and D yard from 9 am to 3 pm Mon — Fri? Man! Puro pinche party how about pisto? I know drugs are everywhere and pisto tambien but do you drink it? How about getting high? I likes to cook too and know how to work with this canteen stuff so manda some recetas so I can hook it up when I hit state. I don't know if the canteen stuff you girls get is the same as for us in a Level 4 yeard but I think it's cool que no? . . . [¶] Listen if I run into Cris I will advice him to do right and I wont mention we talked about it. I'm also gonna talk to a señor and see his response."

The letter was signed "Chingon Kanpol" with the text "ES Wilmas GTL" under the signature.

Clift gave the jury his interpretations of certain portions of the letter. He testified that the last passage within the letter — "Listen if I run into Cris I will advice him to do right and I wont mention we talked about it. I'm also gonna talk to a señor and see his response" — meant that defendant was "going to talk to Cris, Cris being the co-defendant of this woman that he's writing a letter to, about the case [she was involved in], telling him that he should take all responsibility for the crime that Cris and this lady he's writing the letter to were involved in, and he's going to go talk to a senor and see what that senor recommends, 'senor' meaning a Mexican Mafia member." According to Clift, defendant would ask the señor "if Cris should be killed or he should be beat up or threatened or taxed." The prosecutor clarified, "[S]o in reading this, is it your belief or opinion that the defendant is willing to harm Cris if he doesn't do what he advises him to do as in taking the entire rap for the crime that they committed together?" Clift answered, "[T]hat's correct." After Clift testified regarding the letter to Gomez, the defense stipulated to the admission of the letter to De La Cruz in its entirety.[38]

---

[38] The letter to De La Cruz included defendant's statements, "I ain't trippin', this is the way we gangster's roll the party ain't over it's just getting started. [This statement was followed by a drawing of a smiling face.] On the other hand la doña is takin it hard I expressed what's in the near future and she felt better. She just blaims herself for my life style and she shouldn't. I chose this vida and I'm gonna die living it the love for my jefa goes without saying but I lead a life that I can no longer walk away. She understands. . . . [¶] . . . My point is don't get involved in the sureño politic because you do not have anyone to back you up if you make a minor error. A lot of homies don't,

The People assert, again, that the letter to Gomez was admissible as section 190.3, factor (b) evidence because it manifested another threat to a witness prohibited by section 140. The People also argue that the letter and the circumstances surrounding its seizure were admissible to rebut evidence the defense had offered in mitigation through its correctional consultant. We question whether the letter was admissible under section 190.3, factor (b) as evincing a violation of section 140, but agree that it, and testimony regarding how it was obtained, were admissible as rebuttal evidence.

The People justify the admission of this evidence under section 190.3, factor (b) on the ground that "insofar as the letter indicated appellant would arrange with a 'senor' to have Cris attacked, it involved a threat 'to use force or violence upon the person of a witness to a crime' " prohibited by section 140. Yet section 140 reaches such threats only when they occur "because the witness, victim, or other person has provided any assistance or information to a law enforcement officer, or to a public prosecutor in a criminal proceeding or juvenile court proceeding." (*Id.*, subd. (a).) The People point to no testimony or other evidence in the record indicating that Cris had provided assistance or information to a law enforcement officer or prosecutor. The ostensible purpose of defendant's letter was to get Cris *to* talk to law enforcement and claim responsibility for

---

thats why they don't stand up to the repas. Pero si tienas problemas for example the crimy issue you mention to me I could assist and the señores I know Tambien. If something needs to be done don't volunteer to do it wait till you're asked. But if you feel you can't accomplish it for whatever reason speak up before you comit yourself. Southsider and sureño are two different cosas."

the crime, not to retaliate for his having provided information or other assistance to authorities.

The People offer no other statutory hook justifying the admission of this letter under section 190.3, factor (b).  Yet that does not mean the trial court erred in allowing the letter and the circumstances surrounding its recovery to be offered as evidence.  The letter and defendant's attempt to smuggle it out of jail through his mail amounted to proper rebuttal proof to defense evidence that had been offered at the penalty phase.  "A trial court has broad discretion when determining the admissibility of rebuttal evidence . . . ."  (*People v. Simon* (2016) 1 Cal.5th 98, 145.)  When the defense elicits testimony from experts suggesting that the defendant will not be dangerous in prison, the prosecution may, within reasonable parameters, offer proof suggesting the opposite.  (*People v. Benson* (1990) 52 Cal.3d 754, 798.)

Before the prosecution obtained a ruling on the admissibility of the letters to Gomez and De La Cruz, the defense announced that it intended to offer testimony from its correctional consultant, Esten.  The defense would characterize this testimony as concerned with "the ability of the correctional department to secure Mr. Pineda," with defense counsel later explaining that "[t]he bottom line of what I plan to present is that the Department of Corrections can house him, and he would not be a threat to another inmate nor to the officers who protect the facility and the inmates."

When called to the stand, Esten described the conditions at the facilities where defendant was most likely to be housed, should he to be sentenced to life without the possibility of parole. This testimony touched upon the safety precautions taken at

those institutions. In response to defense counsel's question whether defendant would pose a danger to inmates or staff if put in a secure housing unit, Esten replied, "I can't say that. I can only tell you that the California Department of Corrections and Rehabilitation has means and ways of dealing with inmates of every ilk. [¶] Some of the disciplinaries that I have seen that he has been involved in in the course of the 90 cases I have reviewed are of the most serious. That is what a security housing unit is made for. That is what an indeterminate term in a security housing unit is designed for. [¶] Will he continue such behavior? I'm not a seer. I can't tell you yes or no. I don't know. I can tell you that he has been disciplinary free since July 30 of '05. That in itself, given the previous record that he had, is quite remarkable, so it's saying that he can do it when he sets his mind to it."

In other testimony elicited by the defense, Esten acknowledged that although one of the facilities that might house defendant, should he be sentenced to life without the possibility of parole, had been designed to break inmates' gang allegiances, "for the most part, it has not worked . . . . [M]any of them are still gang members and continue in the activities that . . . put them there." Upon follow-up questions from the defense, Esten also testified that at such facilities, inmates tended to band together along ethnic and geographic lines and that "[defendant] is a Southern Mexican. He will run with other Southern Mexicans [in prison]. If he chooses not to run with other Southern Mexicans, he will receive pressure from those who are grouped together and essentially forced into that type of behavior or be excluded from association with them, which in many cases can be worse than being associated with them."

The evidence regarding defendant's letter to Gomez, including his attempt to smuggle this letter through his legal mail, represented a proper response to Esten's testimony. Proof that defendant had recently misused his legal mail privileges undermined the expert's surmise that defendant may have turned a new leaf by being "disciplinary free" since July 2005.[39] The contents of the letter to Gomez also were responsive to Esten's point that "the California Department of Corrections and Rehabilitation has means and ways of dealing with inmates of every ilk." The letter's contents gave bite to the possibility that, notwithstanding this testimony, defendant might participate in gang activity at a facility where he would serve a sentence of life without the possibility of parole — as Esten conceded had occurred with other inmates.[40]

The conclusion that the letter's contents and the circumstances surrounding its interception represented proper rebuttal evidence finds support in our treatment of a similar issue in *People v. Schultz* (2020) 10 Cal.5th 623. The defense evidence in mitigation there also included testimony from a penology expert who opined that the "defendant would conduct himself in an obedient and cooperative manner if sentenced to life in prison without the possibility of parole." (*Id.*, at p. 664.)

---

[39] The trial court also allowed the prosecution to cross-examine Esten and offer evidence in its rebuttal case regarding the December 29, 2006 search of defendant's cell that yielded contraband, but it did not permit the prosecution to inform the jury that this incident involved pornographic material.

[40] This evidence having substantial rebuttal value that was not substantially outweighed by countervailing considerations, we reject defendant's argument that it should have been excluded for all purposes under Evidence Code section 352.

The trial court allowed the prosecution to respond by introducing evidence regarding (1) the defendant's gang tattoos, which likely had been obtained in prison; (2) defendant's correspondence with a gang member (though excluding the letters' contents); and (3) the use of friendly appellations and valedictions by defendant and his correspondent in these letters. (*Id*., at pp. 665–666.) We held that the prosecution's evidence amounted to fair rebuttal, citing to past cases that have reached similar conclusions on analogous facts. (*Id*., at pp. 668–670, citing, e.g., *People v. Mattson* (1990) 50 Cal.3d 826, 878.) With regard to the letters, we explained, "[T]he fact defendant and a former leader of a white supremacist gang had exchanged letters in which defendant referred to the former gang leader as 'homey' created an inference that undermined the expert testimony that defendant would make a positive adjustment to life in prison." (*Schultz*, at p. 669.)

If there was any error in admitting the letter to Gomez, then, the mistake was that jurors should not have been allowed to consider its contents as section 190.3, factor (b) evidence — as the penalty phase jury instructions (which referenced "sending threatening letters" among the factor (b) evidence that was before the jury) allowed, and the prosecution's closing arguments encouraged, them to do. We do not regard any such misstep as having prejudiced defendant, however. Given the permissible use of the letter as rebuttal evidence, as well as the circumstances of the crime and the other section 190.3, factor (b) evidence — including the letter to Della Rose Santos that could have been construed as threatening an informant and was, as previously determined, properly submitted to the jury as involving a possible violation of section 140 — it is not reasonably possible that the penalty phase result was affected

by allowing the jury to consider this evidence as potentially aggravating on the specific ground that it manifested a crime involving a threat of force or violence.

### 3. *Trial Court's Role with Factor (b) Evidence*

Defendant also argues that the trial court erred when it instructed the jury at the close of the penalty phase that evidence had been introduced for the purpose of showing defendant had committed "criminal acts which involve the express or implied use of force or violence or the threat of force or violence" and then summarized the section 190.3, factor (b) evidence that had been offered by the People. Defendant asserts that the characterization of this evidence as "involv[ing] the express or implied use of force or violence or the threat of force or violence" usurped the role of the jury to determine whether these acts were in fact of such character, and for that reason contravened the death penalty statute and violated his state and federal constitutional rights to a jury trial, due process, and a reliable penalty determination.

As defendant acknowledges, we have in prior cases rejected his argument regarding the respective roles of the court and the jury in connection with section 190.3, factor (b) evidence. We have determined that although "[t]he question whether the acts [offered as factor (b) evidence] occurred is certainly a factual matter for the jury, . . . the *characterization* of those acts as involving an express or implied use of force or violence, or the threat thereof, [is] a legal matter properly decided by the court." (*People v. Nakahara* (2003) 30 Cal.4th 705, 720; see also *Delgado, supra,* 2 Cal.5th at pp. 588–590.) Defendant provides no persuasive reason why we should reconsider our prior conclusions, and we decline to do so.

### 4. *Challenges to the Death Penalty and to Penalty Phase Jury Instructions*

Defendant attacks certain jury instructions that were given at his trial and various facets of our state's death penalty statutory scheme. We reject these arguments, as we have done in the past, as set out below.

The roster of death-eligible defendants under section 190.2 is not impermissibly overbroad; "California homicide law and the special circumstances listed in section 190.2 adequately narrow the class of murderers eligible for the death penalty . . . ." (*Demetrulias, supra*, 39 Cal.4th at p. 43; see *People v. Leon* (2020) 8 Cal.5th 831, 853 (*Leon*).)

Section 190.3, factor (a)'s direction that, in determining the appropriate penalty, the jury shall take into account any relevant "circumstances of the crime of which the defendant was convicted" does not result in the arbitrary and capricious imposition of the death penalty or cause California's capital sentencing scheme to violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (*Leon, supra*, 8 Cal.5th at p. 853; *People v. Winbush* (2017) 2 Cal.5th 402, 488 (*Winbush*).)

We adhere to our earlier precedents holding that (1) the death penalty statute does not violate the United States Constitution insofar as it does not require findings made beyond a reasonable doubt regarding the existence of specific aggravating factors (other than section 190.3, factors (b) and (c)), that aggravating factors outweigh mitigating factors, or that death is the appropriate sentence (*Turner, supra*, 10 Cal.5th at p. 828; *People v. Miles* (2020) 9 Cal.5th 513, 605–606); (2) a jury need not be instructed that the State has the

burden of proof or persuasion regarding the existence of any factor in aggravation (again, except for section 190.3, factors (b) and (c)), whether aggravating factors outweigh mitigating factors, and the appropriateness of the death penalty; nor that it is presumed that life without the possibility of parole is an appropriate sentence (*Turner*, at p. 828; *People v. Romero and Self* (2015) 62 Cal.4th 1, 57; *People v. Adams* (2014) 60 Cal.4th 541, 581; *People v. Cruz* (2008) 44 Cal.4th 636, 681); and (3) the death penalty scheme does not violate the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution for failing to require "unanimous findings as to proof of each aggravating factor or unadjudicated crime" (*Turner*, at p. 828).

There was also no error in the trial court's failure to instruct the jury that there was *no* burden of proof, except again as to prior convictions and conduct admitted under section 190.3, factors (b) and (c). (*People v. Rivera* (2019) 7 Cal.5th 306, 347.)

The "so substantial" language within CALJIC 8.88 is neither overbroad nor unconstitutionally vague. (*Leon*, *supra*, 8 Cal.5th at p. 853.) This instruction is also not constitutionally deficient for failing to explicitly instruct jurors that they are to return a sentence of life without the possibility of parole if they determine that the mitigating factors outweigh the aggravating factors. (*Chhoun*, *supra*, 11 Cal.5th at p. 55.)

The fact that the penalty phase jury instructions here did not set forth a burden of proof, except for the jury's consideration of section 190.3, factors (b) and (c) evidence, did not impermissibly foreclose the consideration of constitutionally relevant mitigating evidence by improperly shifting burdens to the defense. (*People v. Pearson* (2013) 56 Cal.4th 393, 478.) Nor

is an instruction explaining that jurors need not unanimously agree regarding the existence of particular mitigating factors constitutionally required (*Bryant, supra*, 60 Cal.4th at p. 457); here, in any event, the jury *was* instructed at the close of the penalty phase that it "need not be unanimous in finding that an aggravating or a mitigating circumstance exists."

The lack of a requirement that the jury make written or other specific findings at the penalty phase does not foreclose meaningful appellate review of defendant's sentence or violate defendant's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (*Leon, supra*, 8 Cal.5th at p. 853; *Winbush, supra*, 2 Cal.5th at p. 490.)

The use of adjectives such as "extreme" and "substantial" in describing certain kinds of mitigating evidence under section 190.3 (e.g., § 190.3, factors (d), (g)) does not violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (*Turner, supra*, 10 Cal.5th at p. 828.)

Defendant contends that the trial court's failure to delete sentencing factors that are inapplicable to his case violated his constitutional rights. Defendant identifies two factors as inapposite but nevertheless included in the court's instructions — section 190.3, factor (e) (whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act) and factor (f) (whether the defendant reasonably believed the circumstances morally justified or extenuated his conduct). But we have held that "[t]he court is not constitutionally obligated to delete inapplicable sentencing factors" (*Turner, supra*, 10 Cal.5th at pp. 828–829), and defendant offers no good reason why we should reach a different conclusion here.

The absence of a specific advisement in the jury instructions regarding which of the sentencing factors set forth in CALJIC 8.85 were aggravating, which were mitigating, and which could be either aggravating or mitigating depending on the jury's assessment of the evidence did not violate defendant's constitutional right to a reliable and individualized sentencing determination. (*Leon*, *supra*, 8 Cal.5th at p. 854.)

The absence of intercase proportionality review as part of capital sentencing did not violate defendant's constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (*Turner*, *supra*, 10 Cal.5th at p. 829; *Leon*, *supra*, 8 Cal.5th at p. 854)

The fact that the penalty phase of a death penalty trial does not incorporate certain procedures found in noncapital trials does not violate equal protection. (*Turner*, *supra*, 10 Cal.5th at p. 829; *People v. Burney* (2009) 47 Cal.4th 203, 268; *People v. Manriquez* (2005) 37 Cal.4th 547, 590.)

California's use of the death penalty, whether at all or, in defendant's words, "regular[ly]," does not violate international law or evolving standards of decency in violation of the Eighth and Fourteenth Amendments to the United States Constitution. (*Turner*, *supra*, 10 Cal.5th at p. 829; *Leon*, *supra*, 8 Cal.5th at p. 854.)

### D. Cumulative Error

Finally, defendant argues that even if individual errors at trial were harmless, their cumulative impact requires reversal of the judgment below. We disagree.

The foregoing analysis has held or assumed that the following errors may have occurred at trial, with the claims of error being preserved (or assumed to have been preserved) by

the defense: (1) the premature introduction of evidence regarding defendant's possession of contraband in jail; (2) the admission of evidence concerning an altered paper clip and the possible use of such a clip; (3) Palacol's recitation of a guard's reference to defendant possessing shanks in jail; (4) the admission of evidence that defendant was involved in a jailhouse fight in 2002; and (5) the submission of the Gomez letter to the jury as section 190.3, factor (b) evidence, as opposed to it being used only for rebuttal. Even if we were to regard all of these as missteps to determine their collective impact, we perceive no prejudice under any standard.

The most compelling argument for finding prejudice relates to the impact this evidence might have had in persuading jurors that defendant was so incorrigibly dangerous as to make death the appropriate penalty. Yet there is no realistic possibility that this evidence altered the perception generated by other, properly admitted evidence — most notably, the incident in which defendant threatened to stab a jail guard and kicked another; defendant's threatening of another inmate by calling him a "rat" and leading other inmates to chant the same; the statements defendant made in his letter to Della Rose Santos; and the circumstances of the charged crimes, especially the murder of Tinajero, in which defendant navigated his way around jail security to kill another inmate, his erstwhile coperpetrator. Even recognizing the significant emphasis the prosecutor placed on the section 190.3, factor (b) evidence in her closing statement at the penalty phase, it is clear beyond any reasonable doubt that any mistakes in the admission of certain evidence did not affect the outcome. " 'Defendant has demonstrated few errors, and we have found each error or possible error to be harmless when considered separately.

Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment.' " (*People v. Panah* (2005) 35 Cal.4th 395, 479–480; see also *People v. Johnson* (2019) 8 Cal.5th 475, 525 [finding four possible errors at the penalty phase nonprejudicial, whether considered alone or together].)

## III.  DISPOSITION

We affirm the judgment in its entirety.


**CANTIL-SAKAUYE, C. J.**


**We Concur:**

**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**GUERRERO, J.**

PEOPLE v. PINEDA

S150509


Concurring Opinion by Justice Liu


The penalty phase of this capital case raises an issue under the Sixth Amendment to the United States Constitution that I discussed recently in *People v. McDaniel* (2021) 12 Cal.5th 97, 157 (*McDaniel*) (conc. opn. of Liu, J.). The issue is this: In *Apprendi v. New Jersey* (2000) 530 U.S. 466, the high court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490.) "[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. [Citations.] In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." (*Blakely v. Washington* (2004) 542 U.S. 296, 303–304 (*Blakely*).)

"Under [California's] death penalty scheme, 'the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*' (*Blakely, supra,* 542 U.S. at p. 303) upon a conviction for first degree murder and special circumstance true finding — with nothing more — is life imprisonment without parole. A death verdict is authorized only when the penalty jury has unanimously determined that 'the aggravating circumstances outweigh the mitigating circumstances' (Pen. Code, § 190.3; see

*People v. Brown* (1985) 40 Cal.3d 512, 541–542, fn. 13, revd. on other grounds *sub nom. California v. Brown* (1987) 479 U.S. 538) — which necessarily presupposes that the penalty jury has found at least one Penal Code section 190.3 circumstance to be aggravating. . . .  Our cases have not satisfactorily explained why this additional finding of at least one aggravating factor, which is a necessary precursor to the weighing determination and is thus required for the imposition of a death sentence, is not governed by the *Apprendi* rule." (*McDaniel*, *supra*, 12 Cal.5th at pp. 158–159 (conc. opn. of Liu, J.).)  In *McDaniel*, I discussed this concern at some length and concluded that "the 20-year arc of the high court's Sixth Amendment jurisprudence [since *Apprendi*] raises serious questions about the constitutionality of California's death penalty scheme." (*Id.* at p. 176.)  I continue to believe that "this court, as well as other responsible officials sworn to uphold the Constitution, [should] revisit this issue." (*Ibid.*)

The case before us illustrates the problem.  At the penalty phase, the jury was instructed that any unadjudicated criminal acts by defendant Santiago Pineda had to be proven beyond a reasonable doubt before they could be considered an aggravating circumstance under Penal Code section 190.3, factor (b). (Maj. opn., *ante*, at p. 83, fn. 33.)  The jury was also specifically instructed that unanimity was not required as to factor (b) findings.  Pineda argues that this lack of a unanimity requirement violates due process and the Fifth, Sixth, Eighth, and Fourteenth Amendments.  He acknowledges we have rejected this claim (see *People v. Ward* (2005) 36 Cal.4th 186, 221–222; *People v. Anderson* (2001) 25 Cal.4th 543, 590) but asks us to reconsider our precedent.

In *McDaniel*, I explained the issue this way:  "Suppose the prosecution introduces evidence of three prior criminal acts (A, B, and C).  Some jurors may find that A was proven beyond a reasonable doubt, but not B and C; other jurors may find B proven, but not A and C; others may find C proven, but not A and B; and still others may find none proven at all and instead find some other circumstance to be aggravating.  Or the jurors may find various prior crimes proven beyond a reasonable doubt but differ as to which one or ones are aggravating.  There is little downside for the prosecution to provide a broad menu of aggravating evidence for the penalty jury to consider . . . .  Our capital sentencing scheme allows the penalty jury to render a death verdict in these circumstances.  But I am doubtful the Sixth Amendment does."  (*McDaniel*, *supra*, 12 Cal.5th at pp. 159–160 (conc. opn. of Liu, J.), citation omitted.)  The facts here present exactly this issue.

The prosecutor introduced evidence of several prior crimes allegedly committed by Pineda while in custody:  (1) a June 2002 fight in the jail dayroom; (2) Pineda's possession of a shank in his jail cell in March 2003; (3) a December 2003 incident in which Pineda threatened another inmate to obtain his wristband, which he used in an attempted escape; (4) his possession of a razor blade removed from its casing and a syringe in his cell in July 2004; (5) a November 2004 incident in which he threatened to stab a deputy and assaulted another deputy by kicking and spitting at him; (6) a December 2004 incident in which Pineda concealed an object (later found to be a bag of potato chips) from a deputy and, when challenged, assumed what the deputy described as a "defensive stance or possibly an offensive stance"; (7) a September 2005 incident in which he yelled that another inmate was a "rat" and led other

inmates to chant the same; (8) a June 2005 incident in which he was found to be in possession of an altered paperclip, which, a deputy testified, could be used as a handcuff key; (9) Pineda's September 2006 letter to Della Rose Santos, which was interpreted by a gang expert as an offer to assault or kill someone who had snitched on another member of the gang; and (10) his January 2007 attempt to smuggle out personal letters as "legal mail," including one letter that appeared to refer to his murder of Tinajero and offered to pressure the recipient's codefendant to take responsibility for their crime.

Discussing this evidence, the prosecutor said in her penalty phase closing argument: "This is where the defendant has earned his death sentence, because he has proven it over and over and over again that even locked up, he is not safe. Even locked up, he can get around the rules. Any rule you throw at him, he finds a way to circumvent it. [¶] . . . This evidence, ladies and gentlemen, of the defendant's conduct while in custody proves to us that if the defendant is allowed to live, others [sic] lives are in danger. Anybody who crosses this defendant's path or the paths of his friends, for that matter, is in danger if this defendant is given the gift of life." The prosecutor subsequently added: "And this evidence, this [Penal Code section 190.3,] factor (b) evidence . . . is enough to tip that scale in favor of a death verdict." Further, the prosecutor specifically told the jury that unanimity was not required with respect to the factor (b) evidence: "So before you can use the evidence from factor (b) to add to the aggravating factors, you must be satisfied beyond a reasonable doubt that we have proven each instance, each thing that happened here that's up on this chart. [¶] But it's important to know that this is an individual determination. Each one of you individually decides

do I believe beyond a reasonable doubt that he was involved in the fight in the day room?  Do I individually believe he had a shank in his jail cell?  [¶] You don't go back into the jury room and talk amongst each other did you believe it beyond a reasonable doubt? Did you believe it beyond a reasonable doubt? No.  It's your decision.  If you believe it happened beyond a reasonable doubt, then you can use it in your determination as to the appropriate verdict.  It doesn't matter what your fellow jurors think about that."

I find it troubling that the Penal Code section 190.3, factor (b) evidence offered here was not particularly strong.  For example, the primary evidence that Pineda participated in a fight in the Men's Central Jail dayroom in June 2002 was the deputy's observation that Pineda's knuckles were red and that he had scratches on his back.  Coupled with the deputy's testimony that he would not have written a report on Pineda for the incident if he had reason to believe that Pineda was the victim, the prosecutor asked the jury to infer from this evidence that Pineda was engaged in mutual combat and not self-defense, asserting that "you don't get redness on your knuckles unless you're hitting somebody else."  The incident in which Pineda was alleged to have yelled, "You're a rat" at another inmate would constitute criminal conduct in violation of Penal Code section 140 only if the jury found that "a reasonable listener would understand [this statement], in light of the context and surrounding circumstances, to constitute a true threat, namely, 'a serious expression of an intent to commit an act of unlawful violence' [citation], rather than an expression of jest or frustration."  (*People v. Lowery* (2011) 52 Cal.4th 419, 427.)  Similarly, his letter to Santos was subject to multiple interpretations.  A deputy testified that Pineda was offering to

assault or kill an inmate who had snitched on another gang member when he wrote, "Grumpy told me about that guera that turned over the dime. Their [sic] treating him bad but that will be straighten [sic] out soon we ride for the sur tu sabes babe, 'one for all, all for one.'" But Pineda countered that he was offering to talk to the deputies to leave Grumpy alone "because they were beating him up."

Would the jury have determined that these incidents were unadjudicated crimes and thus aggravating circumstances under Penal Code section 190.3, factor (b) if unanimity and not just proof beyond a reasonable doubt were required? Without a unanimity requirement, each juror was permitted to reach his or her own conclusion as to whether any of the ten incidents offered by the prosecutor had been satisfactorily proven to constitute prior criminal activity. As the prosecutor said: "If you believe it happened beyond a reasonable doubt, then you can use it in your determination as to the appropriate verdict. It doesn't matter what your fellow jurors think about that." However, "[t]here is a world of difference between a unanimous jury finding of an aggravating circumstance and the smorgasbord approach that our capital sentencing scheme allows." (*McDaniel, supra,* 12 Cal.5th at p. 176 (conc. opn. of Liu, J.).) Whether "the smorgasbord approach" comports with the Sixth Amendment is an issue this court should revisit soon.

We need not confront the issue in this case, however, because any *Apprendi* error as to Penal Code section 190.3, factor (b) findings was harmless. (*Washington v. Recuenco* (2006) 548 U.S. 212, 221–222 [*Apprendi* error is not structural and does not require reversal if harmless beyond a reasonable doubt].) In assessing whether *Apprendi* error is harmless, the high court has instructed that the proper inquiry

is whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." (*Neder v. United States* (1999) 527 U.S. 1, 18 (*Neder*).) In conducting this inquiry, "a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." (*Id.* at p. 19; see *id.* at pp. 16–17 [finding *Apprendi* error is harmless where the evidence as to a disputed element was uncontested and "overwhelming"].) Pineda's briefing focuses specifically on the application of *Apprendi* to factor (b) evidence; while he says "there is no assurance the jury, or even a majority of the jury, ever found a single set of aggravating circumstances that warranted the death penalty," he does not make an *Apprendi* argument specifically with regard to evidence concerning the circumstances of the crime that the prosecutor introduced under Penal Code section 190.3, factor (a). I believe it is clear beyond a reasonable doubt that a rational jury would have found the factor (a) evidence to establish an aggravating circumstance for purposes of capital sentencing.

The evidence showed that Pineda murdered two people: Rafael Sanchez, in order to steal his car, and Raul Tinajero, in order to prevent him from testifying at Pineda's retrial. The prosecutor focused on the brutality of these murders in her closing argument: "Think about [Sanchez] that day. He met the defendant and [Tinajero], he befriended them and then he was betrayed by them. Imagine the anger he felt when these guys he had just befriended stole his car. And then imagine the relief he felt when he said, you know, give me my car back, and they go, okay, we'll take you to your car, only to later realize he had been betrayed again when he felt the defendant's hands reach around and encircle his neck. [¶] Imagine the fear. Imagine the

fear he felt when the defendant began to squeeze harder and harder and he could no longer take in a breath. Squeeze so hard that he actually lost consciousness. [¶] Then he's shoved out of the car like he's nothing, and the defendant starts running him over. Imagine the pain he felt as the weight of his car ran him over again and again and again. Imagine the agony he must have been feeling as his body was crushed under that weight. [¶] And then you can imagine the relief he must have felt when he actually saw that car drive away and he began the agonizing effort to crawl down the alley thinking, God, if I can just get to help, somebody can help me, I can survive this. If I can just get out of this alley, maybe I'll make it. [¶] And that little glimmer of hope he had must have been crushed when he saw to his own horror his white Infiniti barreling down on him again, and then imagine the pain he must have felt when that car rolled over him again crushing his already mangled body again under the weight of the car. [¶] He had to know at that point there was no chance he was going to survive." She continued: "It was brutal, it was malicious, and it was sadistic, and count 1, the murder of [Sanchez], is more than enough to tip those scales in favor of a verdict of death."

The prosecutor offered similarly strong arguments regarding the circumstances of Pineda's murder of Tinajero: "Now, think about [Tinajero]. . . . [¶] Imagine the terror he must have felt when he is ripped from a dead sleep with the defendant's arm around his neck, when he opens his eyes and he sees it is the defendant. He must have been thinking, oh, my god, I'm dead. I am dead. [¶] And he struggled. He didn't want to die. . . . He struggled to get that guy's arms off of his neck. He struggled so hard he was spitting up blood. He struggled so hard he defecated on himself. He struggled and then he stopped.

Then the struggle was over. [¶] [Tinajero] was probably dead at this point, but did that stop the defendant? No. This was personal to the defendant. . . . [¶] He shoves [Tinajero's] head in the toilet. It's inhumane. And then he flushes again and again. [¶] But that's not enough. . . . Let's humiliate, let's just denigrate him as much as possible, and [Pineda] shoves him on the ground and he stomps on his neck so hard that the people in the cell could hear the bones crushing, the bones cracking. . . . [¶] But again dead isn't enough for this guy. So he takes that ligature and he ties it around [Tinajero's] neck, and he ties it tight just to bring the point home you don't mess with me. [¶] And then what does he do with [Tinajero]? He shoves him under the bunk . . . like he's a piece of meat, like he means nothing. . . . And then he sits in the cell for hours chatting like it's no big deal. Hey, yeah, this is better for my case, yeah, you know, him or me. [¶] It was no big deal to him. He had just snuffed out the life of a human being and he acted like it was no big deal."

The aggravating evidence concerning the circumstances of the crime was very strong; it was also uncontested at the penalty phase. I thus see no reasonable possibility that a rational jury would not have found one or more circumstances of the crime to constitute a factor in aggravation. (*Chapman v. California* (1967) 386 U.S. 18, 24; see *Neder*, *supra*, 527 U.S. at pp. 16–17.) On this basis, I concur in today's judgment affirming Pineda's death sentence. And I join today's opinion affirming the underlying convictions.

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Pineda

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S150509
**Date Filed:** June 27, 2022

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  William R. Pounders

_____

**Counsel:**

Michael Hersek and Mary K. McComb, State Public Defenders, Gary D. Garcia and Jessica E. Oats, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Gerald A. Engler, Chief Deputy Attorney General, Lance E. Winters, James William Bilderback II and Scott A. Taryle, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jessica E. Oats
Deputy State Public Defender
1111 Broadway, Suite 1000
Oakland, CA 94607
(510) 267-3300

Scott A. Taryle
Deputy Attorney General
300 South Spring Street
Los Angeles, CA 90035
(213) 269-6073